**Silence Law Group, PLLC**
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024
**Jeffrey Silence** (029143)
Direct Dial: (602) 932-8358
Email: jeff@silencelaw.com
**Trevor Cook** (037952)
Direct Dial: (602) 932-5868
Email: trevor@silencelaw.com

**Shields Petitti & Zoldan, PLC**
**James Burr Shields**
Direct Dial : (602) 718-3331
Email: burr@shieldspetitti.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cameron Stangel,<br><br>        Plaintiff,<br><br>    v.<br><br>Jeffery Lindsay,<br><br>        Defendant. | Case No.  CV-25-471-JCH<br><br>~~FIRST AMENDED COMPLAINT~~<br>~~AND DEMAND FOR JURY TRIAL~~<br>**SECOND AMENDED COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL**<br><br>(Hon. John C. Hinderaker) |

Plaintiff Cameron Stangel alleges the following and demands trial by jury on all claims and issues for which she has the right to trial by jury.

## **Parties and Jurisdiction**

1.     Plaintiff Cameron Stangel is a citizen of the state of Arizona.

2.     Defendant Jeffery Lindsay is a citizen of the state of Texas.

SILENCE LAW GROUP

3.      From April 12, 2024, until September 2024, Lindsay was an "employer" of Stangel as defined in the following:

        A.      Arizona Revised Statutes ("A.R.S.") § 23-362,

        B.      A.R.S. § 23-371, and

        C.      A.R.S. § 23-1501.

4.      The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Stangel and Lindsay are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Concurrently, the Court has federal question jurisdiction under 28 U.S.C. § 1331 over Stangel's federal claim under the Trafficking Victims Protection Act.

**Stangel Meets Lindsay**

6.      In 2022, Stangel and her long-term partner, Beau Reichert, discovered a property they liked in Bisbee, Arizona, located at 6 Naco Rd. (the "Property").

7.      Stangel and Reichert decided to sell their ranch in Texas and relocate to the Property in Bisbee.

8.      In part due to Reichert's previous experience in the antiques business, he and Stangel had accumulated personal collections of antiques and other collectible items.

9.      Stangel and Reichert decided to sell their personal collections to raise money to purchase the Property and relocate to Bisbee.

10.     For many years, they had attended events comprising the Round Top Antiques festival held twice a year in Round Top, Texas.

11.     They rented a booth space at the Round Top Antiques Festival for the first time in March 2023 to sell their personal items to raise money for the Property and their move.

12.     Because of their success at the spring show, they rented a booth space at the Round Top Antiques Festival fall show in October 2023.

13.     While working their booth at the fall antique show, Stangel and Reichert widely shared their goal to purchase the Property and relocate to Bisbee.

SILENCE LAW GROUP

14.     Lindsay visited Stangel and Reichert's booth multiple times during the show.

15.     From the first day Stangel met him, Lindsay frequently commented about his wealth, including at least once saying he had "more money than God."

16.     At one point, Stangel told Lindsay about why she and Reichert were selling at the antique show and how they hoped to sell their ranch to purchase the Property and relocate to Bisbee.

17.     Lindsay told Stangel he was a west-Texas rancher and might know someone interested in buying Stangel's ranch.

18.     Stangel exchanged phone numbers with Lindsay.

19.     In late March 2024, Lindsay contacted Stangel and asked her to meet up with him at the springtime Round Top Antiques Festival.

20.     Stangel and Reichert agreed to meet Lindsay at the show.

21.     The three spent a couple of hours together walking around the show.

22.     During the visit, Stangel explained to Lindsay that she and Reichert still had not sold their ranch and might have to reevaluate their plan to relocate to Bisbee.

**Stangel and Lindsay Negotiate and Execute the Employment Agreement, and Stangel Moves to Bisbee**

23.     On April 3, 2024, Lindsay texted and called Stangel to offer her a position as his "Personal Travel Coordinator" in return for the Property.

24.     On April ~~12~~11, 2024, Lindsay, Stangel, and Reichert met in Bisbee.

25.     ~~That day~~On April 12, 2024, Lindsay ~~purchased~~signed the papers to purchase the Property while in Bisbee.

26.     Also on that day, Lindsay and Stangel executed the "Personal Travel Coordinator Service Agreement" (the "Employment Agreement"), copy attached as **Exhibit A**.

27.     ~~The Employment Agreement provided that it would commence that day, April 12, 2024, and automatically terminate April 10, 2027.~~

3

SILENCE LAW GROUP

28.27. The Employment Agreement provided that Stangel would provide "travel coordination services" including but not limited to planning and organizing itineraries, preparing documents and applying for visas, booking transportation and accommodations, and providing recommendations for activities.

29.28. The Employment Agreement provided that, "[i]n exchange for" Stangel's travel coordination services, Lindsay would "compensate" her "with and [sic] rightful ownership of the buildings and parcels located at [the Property]."

30.29. The Employment Agreement provided that Lindsay would transfer the Property to Stangel either after the completion of 520 days of "active travel coordination" within 36 months of employment "or upon reaching the termination date [three years after the Employment Agreement goes into effect], whichever comes first."

31.30. The Employment Agreement provided that, in the event of Lindsay's death during the term of the Employment Agreement, "the estate shall immediately and automatically transfer the deeds of the properties located at [the Property] to [Stangel] as compensation for the services rendered."

32.31. The Employment Agreement provided that, during the term of the Employment Agreement, Stangel would pay for the taxes on and insurance for the Property.

32.    Lindsay's purchase of the Property closed on May 15, 2024.

33.    On April 15, 2024, Lindsay called Stangel and asked her to draft a residential lease for the Property ("Lease Agreement").

34.    Lindsay insisted that only Reichert sign the Lease Agreement as tenant.

35.    Stangel drafted the Lease Agreement, and Reichert and Lindsay signed it that day.

36.    The Employment Agreement provided that it would commence the day of signing, April 12, 2024, and automatically terminate April 10, 2027. Ex. A. at 1.

37.    Likewise, the Lease Agreement provided that the term of the lease would run from April 12, 2024, to April 9, 2027.

38.    The Employment Agreement provided that Stangel "will pay the appropriate taxes and insurance on [the Property]." Ex. A at 1.

39.    The Lease Agreement provided that the tenant would pay for utilities, "home insurance throughout the lease term, with coverage for personal property and liability, with [Lindsay] named as an additional insured party," and property taxes.

40.    The Employment Agreement provided that Stangel's duties as Travel Coordinator included planning trips from "home." Ex. A at 1.

41.    Lindsay and Stangel intended that Stangel would live in the Property during the term of the Employment Agreement.

42.    Lindsay and Stangel intended that Stangel would perform some of her duties under the Employment Agreement from "home" at the Property.

43.    The terms of the sale of the Property provided that the seller had approximately thirty days to vacate the property and perform some necessary repairs.

44.    Reichert moved his and Stangel's shared household into the Property in May 2024, after the repairs were completed and escrow closed.

45.    In June 2024, Stangel returned from her first trip with Lindsay as his Travel Coordinator to the Tucson airport and went home from there to the Property.

46.    Lindsay knew Stangel returned "home" to the Property in Bisbee.

47.    Lindsay knew and knows that Stangel has resided at the Property continually since signing the Employment Agreement.

~~33.~~48. The Employment Agreement provided that "the Employer [Lindsay] agrees to cover all expenses associated with the Travel Coordinator position including any necessary equipment needed for travel planning (international WiFi, phones, etc), travel and accommodations, emergency medical, and anything else deemed necessary."

~~34.~~49. Lindsay gave Stangel a credit card to use to pay for her expenses under the Employment Agreement.

~~35.~~50. He also often gave her cash to pay expenses under the Employment Agreement.

SILENCE LAW GROUP

36.51. After she signed the Employment Agreement and until September 25, 2024, Stangel provided pre-travel and travel coordination services in accordance with the Employment Agreement.

37.52. Lindsay directed Stangel to use his money to buy herself new clothes for every trip and anything else she needed.

38.53. Lindsay instructed Stangel to always buy the best of everything and book the most luxurious accommodations for him and Stangel.

39.54. When Stangel asked for budgetary restrictions on those purchases and travel arrangements, Lindsay simply told her to spend and get whatever she needed.

40.55. Stangel asked Lindsay for permission to make any purchases outside of what Lindsay established as customary for their trips.

41.56. Stangel submitted reports of purchases she made as Travel Coordinator every week to Lindsay's assistant, Crystal Slate.

42.57. Lindsay required that Stangel accompany him on all travel she coordinated for him.

**The Trip**

43.58. Stangel coordinated travel for Lindsay, herself, and a husband and wife who were Lindsay's friends on a month-long private jet world tour operated by the Four Seasons (the "Trip").

44.59. Lindsay paid for the Trip for himself, Stangel, and two of his friends.

45.60. Stangel joined Lindsay on the Trip in her role as Travel Coordinator under the Employment Agreement.

46.61. Leading up to the Trip, Lindsay repeatedly told Stangel not to bring any money on the Trip because it was a work trip and he would pay for everything.

47.62. Lindsay, Stangel, and the two friends departed on the Trip in late August 2024.

48.63. While on the Trip, Lindsay questioned aloud how he would explain to other passengers why he and Stangel were staying in separate rooms.

49.64. Lindsay made suggestive comments at dinners with the travel group that embarrassed Stangel, such as telling members of the group that Stangel could not eat too many oysters because she would get too "horny."

50.65. Many times, when Stangel went to Lindsay's room to discuss travel arrangements, Lindsay would answer the door in a state of partial undress and tell her to sit in his room while he dressed.

51.66. When Stangel would try to leave, Lindsay would get mad and blame her for "making" the situation "awkward."

52.67. Lindsay repeatedly asked Stangel to "model" swimwear for him in his room, and Stangel refused.

53.68. Lindsay repeatedly expressed disappointment to Stangel that he never saw her at the pool.

54.69. Lindsay's attitude toward Stangel became increasingly hostile as she rebuffed his unwelcome sexual advances.

55.70. For example, Lindsay told Stangel that if he can't see her in a swimsuit, then the purchase of that swimsuit—which he directed—was now unauthorized.

56.71. Lindsay began accusing Stangel of not following the Employment Agreement by using his money to pay unauthorized expenses.

57.72. But Lindsay had previously directed, approved, or encouraged all of Stangel's purchases as Trip Coordinator she made using the credit card and cash he gave to her to pay expenses under the Employment Agreement.

58.73. Stangel offered to print out for him the weekly expense reports she had provided to his assistant, Crystal Slade, and the credit card statements.

59.74. Lindsay refused the offer.

60.75. Stangel printed out the reports and credit card statements anyway and gave them to Lindsay, who accepted them from her.

61.76. Lindsay started to tell Stangel she was in debt to him under the Employment Agreement and would need to find a way to repay him.

7

62.77. Lindsay threatened to sue Stangel for the "debt" she owed him.

63.78. Lindsay threatened he would bring felony charges against her.

64.79. Lindsay repeatedly told Stangel that she would not have to repay him through "sex."

65.80. Lindsay told Stangel the only reason he had not had sex with her, yet, was because he was a "gentleman."

66.81. Lindsay implied by his words and actions that he would withdraw his accusations and legal threats and resume reimbursing Stangel for expenses if she would have sex with him.

67.82. Lindsay's sexual advances and threatening behavior escalated throughout the Trip.

68.83. On September 11, 2024, Lindsay repeatedly confronted Stangel about her alleged "debts" to him.

69.84. At some point that day, Lindsay took back the credit card he had given Stangel to pay for expenses under the Employment Agreement.

70.85. At different times throughout that day, Lindsay alternated between threatening Stangel to sue her or kick her off the Trip and assuring her she would stay on the Trip and they would resolve their disagreement.

71.86. At some point on that day, Lindsay told Stangel he would "decide [her] fate at sundown."

72.87. Stangel feared abandonment with no money in a foreign country.

73.88. That afternoon, Lindsay expressed that he had decided to put his dispute with Stangel behind him.

74.89. But at 7:45 a.m. the next day, September 12, Lindsay called Stangel demanding a return of all the cash he had given her to cover expenses under the Employment Agreement.

75.90. Stangel returned the cash.

SILENCE LAW GROUP

76.91. Stangel and Lindsay were scheduled to fly together to Jordan later that night separately from the rest of the Trip group.

77.92. Stangel feared for her safety and texted Susan Cegavske, a manager for the Four Seasons on the Trip, and asked to speak with her.

78.93. That afternoon, Stangel met with Cegavske and described Lindsay's behavior and her experience on the Trip.

79.94. Later that afternoon, Lindsay called Stangel and asked her to find him a place where he could consume opium and engage the services of prostitutes.

80.95. Stangel told him she did not know where to find those things, but she would look.

81.96. Stangel was not sure what to look for to fulfill this request, but she researched the Bangkok red light district and sent Lindsay the information for a bar she believed to be a strip club.

82.97. Stangel called Lindsay and again told him she was not sure what to look for and asked if she should relay Lindsay's request to a Four Seasons concierge.

83.98. Lindsay agreed she should do so.

84.99. After ending the call, Stangel called Lindsay back to confirm again that he wanted his request for drugs and commercial sex to be relayed to the concierge.

85.100.    Lindsay confirmed he did.

86.101.    Stangel texted Lindsay's request to a concierge.

87.102.    The concierge explained he could not assist with the request.

88.103.    The manager Susan Cegavske texted Stangel, telling her she had heard about Lindsay's request and asked if Stangel was okay.

89.104.    Stangel called Cegavske, but the call was repeatedly interrupted by calls to Stangel from Lindsay.

90.105.    In the last call, Lindsay asked Stangel if he could come to her room.

91.106.    Stangel said she preferred to meet elsewhere.

SILENCE LAW GROUP

92.107.    Lindsay responded, "Wrong answer" and told Stangel he was coming over.

93.108.    Lindsay came to Stangel's room and knocked on the door.

94.109.    As Stangel opened the door, Lindsay forcefully pushed it open and entered, yelling.

95.110.    Lindsay forced Stangel to back away to avoid physical contact with him.

96.111.    Lindsay continued forward toward Stangel until he backed her against a corner.

97.112.    Lindsay physically blocked Stangel from any exits and continued yelling at her.

98.113.    Stangel told Lindsay she was uncomfortable being alone with him and told him to leave the room.

99.114.    Lindsay did not leave the room.

100.115.    Stangel's luggage was packed and on her bed.

101.116.    Lindsay demanded that Stangel open her luggage and show him what she had in it to confirm she had brought items purchased for the trip and not left them in Bisbee.

102.117.    Lindsay told Stangel that if she showed him all her personal belongings, he would know she was telling him the truth about not stealing from him, but if not, she was lying to him.

103.118.    Stangel refused and told Lindsay she would call for help.

104.119.    Lindsay said that he knew Stangel was a liar and left her room.

105.120.    Stangel immediately told the manager Cegavske about this latest incident.

106.121.    Later in the evening, Cegavske and Director of Guest Experiences Javier Loureiro, told Stangel that Lindsay had called a meeting with all of them.

107.122.    The four met in the lobby.

108.123.    Lindsay began the meeting talking about how beautiful Stangel was.

109.124.    Then, he admitted he came into Stangel's room, blocked her exits, and demanded she unpack her bags for him.

110.125.    He also admitted to tasking Stangel to find him opium and prostitutes.

111.126.    At the end of the meeting, Lindsay said he was cancelling the Employment Agreement and declared that he was now the owner of the Property.

112.127.    In other words, Lindsay terminated Stangel's employment and made it clear that he would not be deeding the Property to her.

113.128.    After Lindsay left the meeting, the hotel staff told Stangel they had arranged for Stangel's and Lindsay's rooms to be on different floors for the remainder of the Trip and that they would take other precautions to protect her safety.

114.129.    Cegavske gave Stangel $500 in U.S. currency and some Jordanian currency to use in case of emergency while she traveled with Lindsay separately from the group to the next stop in Jordan.

115.130.    Even though Stangel was terminated on September 12, 2024, she continued to provide trip coordination services through the end of the Trip on September 24, 2025 because she knew he would be unable to immediately find a replacement.

**Lindsay Retaliates Against Stangel for Filing Her Claims Against Him**

116.131.    Two days after the Trip, Lindsay texted Stangel: "DO YOU WANT TO TALK OR USE THE AMENDMENT CLAUSE….."

117.132.    Stangel did not respond.

118.133.    The following day, Lindsay texted Stangel again: "WELL NOW… NO ANSWER……SO THAT MUST MEAN…….BRING MY LAWYERS AND DO WHAT LAWYERS DO…NASTY….ARE YOU SURE THAT THIS IS THE AVENUE THAT YOU WANT TO TRAVEL…… I WAS THE ONE THAT WAS DONE WRONG ANY WAY YOU LOOK AT IT……"

119.134.    Stangel did not respond.

SILENCE LAW GROUP

1    120.135.    The next day, Lindsay texted: "SURE LY WE CAN  ACT AS
2    ADULTS AND FIGURE THIS OUT …..IM OPEN TO SUGGESTIONS………"

3    121.136.    Once again, Stangel did not respond.

4    122.137.    The next month, October 2024, Lindsay unilaterally and without
5    notice paid the property taxes that were the responsibility of Stangel under the
6    Employment Agreement and of Beau Reichert under the Lease Agreement.

7    123.138.    The next month, November 2024, Lindsay cancelled Stangel's
8    premium payment on the home insurance policy Stangel had purchased for the Property
9    and substituted his own payment for alternative coverage.

10    139.    Lindsay then tried to have Stangel evicted from retained counsel, and in
11    December 2024 they sent a demand letter to Lindsay raising claims Stangel had against
12    him, informing him of document preservation obligations in light of pending litigation,
13    and offering to discuss settlement of the claims.

14    140.    After four months, on April 9, 2025, Lindsay responded through counsel
15    Jeremy T. Shorbe of Burris & Macomber, PLLC.

16    141.    The response denied Stangel's claims and alleged claims against her.

17    142.    Two weeks later, Reichert received a letter at the Property due to her alleged
18    non-payment of signed by Jeremy T. Shorbe of Burris & Macomber, PLLC, the lawyer
19    and firm representing Lindsay in this action.

20    124.143.    The letter accused Reichert of breaking the Lease Agreement by "not
21    provid[ing] proof of insurance on the Property which names my client [Lindsay]," and by
22    failing to pay the property taxes and insurance. preemptively paid by Lindsay.

23    125.    Lindsay's efforts to have Stangel evicted were unsuccessful.

24    144.    The letter offered Reichert the chance to cure the alleged breaches by paying
25    "the outstanding amounts due."

26    145.    Reichert and Stangel obtained counsel ("Eviction Lawyer") to assist and
27    represent them in the Lease Agreement matter.

28

12

146.    Through counsel, Reichert and Stangel attempted multiple times to tender the alleged amount due but were ignored.

147.    Three weeks after the first letter, Shorbe sent another letter to Reichert purporting to terminate the Lease Agreement and stating that "all persons residing at the Property are instructed to immediately vacate the Property."

148.    On June 9, 2025, Lindsay, filed an eviction action naming as defendants Beau Reichert and "John Does 1-3" and "Jane Does 1-3,"

149.    D. Rob Burris and Jeremy T. Shorbe, of Burris & Macomber, PLLC, represented Lindsay in the action.

150.    They are the same lawyers representing Lindsay in this action.

151.    After a hearing, the Justice Court dismissed the case with prejudice.

152.    Lindsay, through his same attorneys who also represent him in this action, appealed the Justice Court's decision.

153.    The eviction action was baseless in part because Lindsay ignored Reichert and Stangel's attempts to cure the alleged breach of the lease.

154.    Lindsay brought the eviction action to retaliate against Stangel's asserting her claims against him and to deter her from seeking legal redress.

155.    Stangel filed her Complaint in this action on August 19, 2025.

156.    The Complaint alleged, among other things, that Lindsay failed to pay Stangel Arizona minimum wage and Arizona sick time.

157.    Lindsay did not answer the Complaint.

158.    Stangel filed a First Amended Complaint on September 29, 2025.

159.    The First Amended Complaint narrowed the relief Stangel sought from the Court but left the claims and factual allegations of the Complaint unchanged.

160.    On November 17, 2025, through his Burris & MacOmber counsel, Lindsay filed a motion to dismiss Stangel's First Amended Complaint.

161.    Three days later, Shorbe, the lawyer who signed the motion to dismiss, sent a "Notice of Inspection" addressed to Reichert, stating that the Property "will be entered

SILENCE LAW GROUP

SILENCE LAW GROUP

and inspected by this firm on behalf of Landlord" "between the hours of 9:00 A.M. and 5:00 P.M." on one of four dates in December from which the letter asked Reichert to choose.

162.    Stangel and Reichert's Eviction Lawyer responded the next day by email on their behalf asking Shorbe to identify the purpose of inspection.

163.    Shorbe responded by email the next day, asserting that that Lindsay, as landlord, had the right to inspect the Property on 48 hours' notice, and that "[d]ue to the nature of the ongoing proceedings, Mr. Lindsay's representatives (likely Crystal Slade and [other counsel with Shorbe in this action] Rob Burris of this office) will attend in his stead so as to have the visit occur in as smooth and peaceable a manner as possible."

164.    In the email, Shorbe continued:

> While you're not entitled to object to any such duly noticed inspection:
> 1. Your clients have asked for thousands of dollars of work to be done;
> 2. We noticed an inspection back in the summer that we stated we would postpone;
> 3. No one on Mr. Lindsay's behalf has seen his Property or what your clients have done to it since Spring of 2024; and
> 4. The landlord doesn't need prior approval to ensure the state of the property so long as he complies with the notice requirements.

165.    Hours later, Stangel's Eviction Lawyer responded by email with Stangel's and Reichert's preferred date and asking Shorbe to identify the purpose of inspection, its scope, expected duration, and the identities and roles of those who would enter the home.

166.    Burris responded and confirmed the selected date, said he anticipated an inspection of no more than two hours, identified himself and his assistant Jo Lynn Goldner as the inspectors, stated "the landlord is not required to provide any basis for the inspection," and stated the reasons had already been provided in Shorbe's email quoted in paragraphs 161 and 162 above.

167.   On December 17, 2025, at approximately 11:00 a.m., Jo Lynn Goldener and Darcy Damron, both from Burris & MacOmber, arrived at the Property to conduct an inspection.

168.   They explained that Burris had planned to attend but could not at the last minute.

169.   After initial pleasantries, no inspection commenced until Stangel's Eviction Lawyer, who was present, suggested that Reichert, who was also present, take Goldener and Damron on a "guided tour."

170.   Goldener agreed and encouraged Reichert to mention any problems he observed with the Property.

171.   Reichert guided Goldener around the Property for about twenty minutes, describing in detail various issues with the property and responding to occasional questions from Goldener.

172.   Goldener carried a legal pad and a document titled "Residential Property Inspection Checklist" that contained checklist items under subjects including "Exterior," "Interior Structure," "Kitchen," "Bathrooms," and "Plumbing System."

173.   Goldener rarely referred to the checklist and never checked an item or took any notes during the duration of the inspection.

174.   At various times, Goldener asked Reichert questions about the Property, but she never took any notes of his detailed answers or visibly took a recording of them.

175.   Halfway through the inspection, Goldener asked about whether and how Stangel's and Reichert's expensive photography equipment was insured.

176.   Damron followed Reichert and Goldener but largely stayed out of Reichert's and Goldener's conversation.

177.   Damron spent most of the inspection time some distance from Reichert and Goldener, taking photographs and video mostly unconnected to the subjects of Reichert's and Goldener's conversation.

SILENCE LAW GROUP

15

178.    The inspection did not help Lindsay fulfill his duties or exercise his rights as a landlord.

179.    The inspection was not intended to help Lindsay fulfill his duties or exercise his rights as a landlord.

180.    Lindsay caused the inspection to be performed to harass and intimidate Stangel in retaliation for her filing her claims against him, including the claims of his failure to pay Arizona minimum wage and sick time.

181.    Lindsay pursues his baseless appeal of the dismissed eviction action targeting Reichert and Stangel in retaliation for Stangel filing her claims against him, including the claims of his failure to pay Arizona minimum wage and sick time.

~~126.~~182.    Stangel and Reichert want to continue renting booth space at the twice-yearly Round Top Antique shows, but they do not because they fear encountering Lindsay there.

**COUNT ONE**
**Breach of Implied Duty of Good Faith and Fair Dealing**

~~127.~~183.    Stangel realleges the above paragraphs as if fully set forth herein.

~~128.~~184.    Every contract in Arizona implies a covenant of good faith and fair dealing.

~~129.~~185.    The implied covenant of good faith and fair dealing prohibits parties from exercising the discretion afforded to them in a contract in a way that deprives the other party of the benefits of the contract.

~~130.~~186.    Lindsay breached the covenant of good faith and fair dealing by purporting to arbitrarily change the nature of Stangel's expenditures under the Employment Agreement.

~~131.~~187.    Lindsay breached the covenant of good faith and fair dealing by attempting to use the Employment Agreement to coerce sexual favors out of Stangel.

~~132.~~188.    Lindsay breached the covenant of good faith and fair dealing by creating an intolerable work environment for Stangel.

SILENCE LAW GROUP

16

SILENCE LAW GROUP

1   ~~133.~~189.    Lindsay breached the covenant of good faith and fair dealing by

2       A.    Terminating Stangel's employment and not transferring title of the

3   Property to Stangel in retaliation for her objecting to his criminal actions and unlawful

4   sexual advances; or, alternatively, by

5       B.    Creating a work environment so hostile it resulted in Stangel's

6   constructive discharge, which meant that Stangel was deprived of the Property that she

7   had been working diligently to earn.

8   ~~134.~~190.    These breaches are material.

9   ~~135.~~191.    Stangel has been irreparably harmed by these breaches because they

10  deprived her of her only benefit of the bargain of the Employment Agreement: title to the

11  Property.

12  ~~136.~~192.    Lindsay's breaches are the direct and proximate cause of the

13  irreparable harm suffered by Stangel.

14  ~~137.~~193.    Stangel is entitled to equitable relief including enforcement of

15  Lindsay's specific performance of the Employment Agreement by giving Stangel title to

16  the Property.

17  ~~138.~~194.    Alternatively, Stangle is entitled to compensatory damages.

18  ~~139.~~195.    Stangel is entitled to an award of attorney fees under A.R.S.

19  § 12-341.01.

20                          **COUNT TWO**

21          **Failure to Pay Arizona Minimum Wage, A.R.S. § 23-364**

22  ~~140.~~196.    Stangel realleges the above paragraphs as if fully set forth herein.

23  ~~141.~~197.    Lindsay did not pay Stangel any wages for any of the time she worked

24  for him pursuant to the Employment Agreement.

25  ~~142.~~198.    Lindsay's failure to pay Stangel any wages for the time she worked

26  for him is a violation of the Arizona Minimum Wage Act.

27  ~~143.~~199.    The expenses that Lindsay paid for Stangel are not "wages" as

28  defined by the Arizona Minimum Wage Act.

SILENCE LAW GROUP

144.200.    Any employer who fails to pay at least the required minimum wage "shall be required to pay the employee the balance of the wages owed, including interest thereon, and an additional amount equal to twice the underpaid wages." A.R.S. § 23-364.

145.201.    Plaintiff is entitled to a total of three times the amount owed in Arizona minimum wage, plus her attorneys' fees and costs, pursuant to A.R.S. § 23-364.

**COUNT THREE**
**Failure to Pay Arizona Sick Time**

146.202.    Stangel realleges the above paragraphs as if fully set forth herein.

147.203.    Arizona employees are entitled to accrue and use "earned paid sick time" for any of the reasons outlined under A.R.S. § 23-373.

148.204.    Lindsay was required to track Stangel's accrued sick time.

149.205.    Lindsay was required to provide Stangel ongoing notice of the amounts of her sick time accrued and used.

150.206.    Lindsay did not track Stangel's accrued sick time.

151.207.    Lindsay did not provide Stangel any notice of her accrued or used sick time or have a sick time policy.

152.208.    Lindsay is liable for paying the full amount of unpaid sick time from the commencement of Stangel's employment on April 12, 2024, through and including September 24, 2025, plus an amount equal to twice that amount and attorney fees as mandated by A.R.S. § 23-364.

153.209.    Stangel has been damaged in an amount to be proven at trial.

**COUNT FOUR**
**Wrongful Termination, A.R.S. § 23-1501**

154.210.    Stangel realleges the above paragraphs as if fully set forth herein.

155.211.    It is unlawful to terminate an employee in retaliation for disclosing to the employer that the employee reasonably believes violates an Arizona statute.

156.212.    Unlawful imprisonment is a crime. A.R.S. § 13-1303.

157.213.    Criminal threatening and assault is a crime. A.R.S. § 13-1202 and A.R.S. § 13-12013.

158.214.    Unlawfully obtaining labor or services through the threat of physical harm is a crime. A.R.S. § 13-1306.

159.215.    Intentionally trying to cause a person to engage in any prostitution or sexually explicit performance by deception, force or coercion is a crime. A.R.S. § 13-1307.

160.216.    Lindsay engaged in conduct that violated each of the statutes listed in paragraphs 156–159.212–215.

161.217.    Stangel objected to Lindsay's unlawful conduct, including when he trapped her in her own room and made her fear for her safety.

162.218.    Hours later, at the meeting with Stangel and Four Seasons staff members Cegavske and Loureiro to discuss the incident, Lindsay said the agreement was cancelled and the Property was his in retaliation for Stangel objecting to his conduct, which conduct violated the criminal statutes listed in paragraphs 156–159.212–215.

163.219.    If Lindsay denies that he terminated Stangel, Stangel pleads an alternative claim for constructive discharge under A.R.S. § 23-1502.

164.220.    Stangel was not required to give 15 days' notice before resigning because Lindsay's criminal conduct was sufficiently outrageous.

165.221.    Stangel was not required to give 15 days' notice before resigning because Lindsay never posted any constructive discharge notice requiring that Stangel provide such notice.

166.222.    Stangel seeks tort damages, except for lost wages, including punitive damages and injunctive relief, including title to the Property.

## COUNT FIVE
### Federal Sex Trafficking, 18 U.S.C. § 1591

167.223.    Stangel realleges the above paragraphs as if fully set forth herein.

~~168.~~224.    Lindsay and Stangel were citizens of different states during the term of the Employment Agreement.

~~169.~~225.    Stangel's responsibilities under the Employment Agreement required planning with different entities and personally traveling with Lindsay to multiple states and countries.

~~170.~~226.    Lindsay intended to coerce Stangel into having sex with him in return for title to the Property.

~~171.~~227.    To that end, Lindsay

A.    Recruited Stangel to be his employee under the Employment Agreement;

B.    Enticed Stangel with seemingly favorable working conditions and opportunities for travel and other enjoyable experiences she would not otherwise have;

C.    Transported Stangel at his expense to locations where she would be financially dependent on him; and

D.    Solicited Stangel to perform a variety of personal services under the aegis of the Employment Agreement.

~~172.~~228.    Lindsay tried to coerce Stangel to have sex with him in return for title to the Property, forgiveness of the "debt" he alleged she owed him, dropping his threat of a lawsuit against her, not stranding her in a foreign country, and allowing her to continue on the Trip by:

A.    Requiring Stangel to accompany him on travel to isolated or foreign locations where she was financially dependent on him;

B.    Implying through his words and actions that Stangel's satisfactory performance of the Employment Agreement depended on her positive response to his sexual advances;

C.    Threatening to leave Stangel alone and without financial recourse in foreign countries as "punishment" for alleged breaches of the Employment Agreement; and

SILENCE LAW GROUP

D.    Threatening to sue Stangel for alleged breaches of the Employment Agreement.

~~173.~~229.    Stangel was damaged in an amount to be proved at trial.

~~174.~~230.    Lindsay's extreme and outrageous behavior in his violation of 18 U.S.C. § 1501 entitles Stangel to punitive damages.

~~175.~~231.    Stangel seeks all available damages, except lost wages, including attorneys' fees and costs under 18 U.S.C. § 1593(b), 18 U.S.C. § 2259(c)(2), and 18 U.S.C. § 1595(a).

~~176.~~232.    Stangel also seeks injunctive relief, including title to the Property. But for Lindsay's actions that violate the federal sex trafficking law, Stangel would have continued working for Lindsay and received title to the Property.

**COUNT SIX**
**Intentional Infliction of Emotional Distress**

~~177.~~233.    Stangel realleges the above paragraphs as if fully set forth herein.

~~178.~~234.    Lindsay's conduct was extreme and outrageous.

~~179.~~235.    Lindsay's extreme and outrageous conduct caused Stangel to suffer severe emotional distress.

~~180.~~236.    Lindsay intended through his behavior to cause severe emotional distress.

~~181.~~237.    Lindsay escalated his extreme and outrageous coercive behavior in reckless disregard of the emotional distress that would result from his conduct.

~~182.~~238.    Stangel seeks all available tort damages for the outrageous conduct she endured.

**COUNT ~~SIX~~SEVEN**
**Unjust Enrichment**

~~183.~~239.    Stangel realleges the above paragraphs as if fully set forth herein.

SILENCE LAW GROUP

SILENCE LAW GROUP

1    ~~184.~~240.    To the extent the jury finds no contract between the parties or that no

2    contract between the parties governed the parties' conduct relative to the claims

3    summarized in Counts One through Four, Stangel pleads this alternative claim for unjust

4    enrichment.

5    ~~185.~~241.    As set forth above, Lindsay was unjustly enriched by Stangel's

6    provision of travel coordination and other personal services without return consideration

7    and in circumstances causing her emotional suffering.

8    ~~186.~~242.    Stangel was unjustly impoverished in many ways by Lindsay's

9    compelling her to provide travel coordination and other personal services in the hope of

10    compensation that never materialized, including but not limited to the costs and

11    inconvenience of moving to a new state with the expectation she would settle there at the

12    Property and not receiving title to the Property.

13    ~~187.~~243.    There is no justification for the enrichment of Lindsay or the

14    impoverishment of Stangel.

15    ~~188.~~244.    Stangel has damages in an amount to be proven at trial.

16
17
**COUNT EIGHT**
**Retaliation for Asserting Rights Under Arizona Minimum Wage Statute**
**A.R.S. § 23-364.B**

18
19    245.    Stangel realleges the above paragraphs as if fully set forth herein.

20    246.    Lindsay arranged for the "property inspection" of December 17, 2025, to

21    harass, intimidate, and drain the physical and mental resources of Stangel in retaliation for

22    her filing her claims against him, including the claim of his failure to pay Arizona

23    minimum wage.

24    247.    Lindsay continues to pursue his baseless appeal of the dismissed eviction

25    action targeting Reichert and Stangel in retaliation for Stangel filing her claims against

26    him, including her claim of his failure to pay Arizona minimum wage.

27    248.    Lindsay's retaliation against Stangel was and is intentional, malicious, and

28    conducted with an evil mind.

249.    Stangel has suffered direct, consequential, and emotional harms from the retaliation compensable in an amount to be determined by the Court.

250.    Stangel is entitled to an amount set by the Court sufficient to compensate her for this retaliation and deter future violations, not less than $150 for each day the violation continues or until legal judgment is final. *See* A.R.S. § 23-364.B and .G.

251.    Stangel seeks all damages available for Lindsay's retaliation against her, including attorneys' fees.

**COUNT NINE**
**Retaliation for Asserting Rights Under Arizona Earned Paid Sick Time Statute**
**A.R.S. § 23-374.B**

1.    Stangel realleges the above paragraphs as if fully set forth herein.

2.    Lindsay arranged for the "property inspection" of December 17, 2025, to harass, intimidate, and drain the physical and mental resources of Stangel in retaliation for her filing her claims against him, including her claim of his failure to pay Arizona sick time.

3.    Lindsay continues to pursue his baseless appeal of the dismissed eviction action targeting Reichert and Stangel in retaliation for Stangel filing her claims against him, including her claim of his failure to pay Arizona sick time.

4.    Lindsay's retaliation against Stangel was and is intentional, malicious, and conducted with an evil mind.

5.    Stangel has suffered direct, consequential, and emotional harms from the retaliation compensable in an amount to be determined by the Court.

6.    Stangel is entitled to an amount set by the Court sufficient to compensate her for this retaliation and deter future violations, not less than $150 for each day the violation continues or until legal judgment is final. *See* A.R.S. § 23-364.B and .G.

7.    Stangel seeks all damages available for Lindsay's retaliation against her, including attorneys' fees.

**<u>Demand for Trial by Jury</u>**

1    Stangel demands trial by jury on all claims and issues.

2    **Relief Requested Against Lindsay**

3    Stangel requests judgment against Lindsay as follows:

4    A.    For specific performance of Lindsay's obligation under the Employment
5    Agreement, namely to take all actions necessary to transfer the Property to Stangel;

6    B.    For the applicable Arizona minimum wage for all hours Stangel worked, for
7    which no payment of any kind was made to Stangel;

8    C.    For an additional amount equal to twice the amount of unpaid Arizona
9    minimum wage as mandated by A.R.S. § 23-364;

10   D.    For unpaid sick time paid at the applicable minimum wage as mandated by
11   A.R.S. §23-364;

12   E.    For an additional amount equal to twice the amount of the unpaid sick time
13   as mandated by A.R.S. § 23-364;

14   F.    All available damages except for lost wages resulting from Lindsay's
15   violation of 18 U.S.C. § 1595, 18 U.S.C. § 1591, and A.R.S. § 23-1501, including
16   injunctive relief, which would include, without limitation, transfer of title for the Property
17   to Stangel;

18   G.    For punitive damages for Lindsay's violation of 18 U.S.C. § 1591 and
19   A.R.S. § 23-1501;

20   H.    For compensatory damages Stangel suffered as a result of Lindsay's
21   intentional infliction of emotional distress;

22   I.    For punitive damages for Lindsay's intentional infliction of emotional
23   distress;

24   J.    For an amount set by the Court sufficient to compensate Stangel for
25   Lindsay's retaliation against her for asserting her rights under Arizona's minimum wage
26   and earned paid sick time statutes and to deter future violations, not less than $150 for
27   each day the violation continues or until legal judgment is final, along with compensatory
28   damages and punitive damages. *See* A.R.S. § 23-364.B and .G;

SILENCE LAW GROUP

24

1    ~~J.~~K.    For attorneys' fees and costs under A.R.S. §§ 12-341 and 12-341.01;

2    ~~K.~~L.    For attorneys' fees and cost under 18 U.S.C. § 1595(a); ~~and~~

3    M.    For attorneys' fees and costs under A.R.S. § 23-364.G; and

4    ~~L.~~N.    Such other relief as the court deems just.

5

6    RESPECTFULLY SUBMITTED this ~~29th~~ _____ day of ~~September, 2025~~_____,

7    202_.

8                                                    **Silence Law Group PLLC**

9

10                                                  _/S/ Trevor Cook_

11                                                  Trevor Cook
                                                    Jeffrey Silence

12                                                  James Burr Shields

13                                                  _Attorneys for Plaintiff_

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**Personal Travel Coordinator Service Agreement**
This agreement (the "Agreement") is entered into on April 12, 2024, between Jeff Lindsay located at Angels Ranch P.O. Box 133 Pecos, Texas, hereinafter referred to as the "Employer," and Cameron Stangel, located at 1145 Perry Road, Austin, TX, hereinafter referred to as the "Travel Coordinator."

This Contract shall commence on April 12, 2024 and shall continue for a period of three (3) years, terminating on April 10, 2027. The Travel Coordinator shall perform and not exceed five hundred and twenty (520) days of active travel coordination within the first thirty-six (36) months of employment.

During periods when active travel is not conducted, the Travel Coordinator's duties will be paused unless the Travel Coordinator is home planning the next trip.

**Services Detail**
The Travel Coordinator agrees to provide personal travel coordination services as detailed in the job description below to the Employer for no more than five hundred twenty (520) days of active travel within the first thirty-six (36) months of employment, in exchange for compensation as detailed below.

**Job Description**
The services include but are not limited to: a. Planning and organizing travel itineraries. b. Making travel arrangements such as organizing documents and visas, booking flights, accommodations, and transportation. c. Providing recommendations for activities and attractions.

**Compensation Detail**
In exchange for services provided by the Travel Coordinator, the Employer agrees to compensate the Travel Coordinator with and rightful ownership of the buildings and parcels located at 6    Naco Rd Bisbee, AZ, Parcel Numbers 103-62-273-A and 103-62-459-A. The property shall be transferred to the Travel Coordinator upon the completion of five hundred and twenty (520) days of active travel coordination within the first thirty-six (36) months of employment, or upon reaching the termination date, whichever comes first.

During the first thirty-six (36) months the Travel Coordinator will pay the appropriate taxes and insurance on the property located at 6    Naco Rd, Bisbee, AZ.

In addition, the Employer agrees to cover all expenses associated with the Travel Coordinator position including any necessary equipment needed for travel planning (international WiFi, phones, etc), travel and accommodations, emergency medical, and anything else deemed necessary.

(Continued to page 2)

(Page 2, continued)

**Death Clause**

In the unfortunate event of the Employer's death during the term of this Agreement, the estate shall immediately and automatically transfer the deeds of the properties located at 6    Naco Rd Bisbee, AZ, Parcel Numbers 103-62-273-A and 103-62-459-A, to the Travel Coordinator as compensation for the services rendered. The estate shall cover all associated taxes, fees, or liabilities resulting from the transfer of the properties. The transfer shall be unconditional and free from any encumbrances or claims. The estate agrees to cooperate fully and promptly in facilitating the transfer of the deeds to the Travel Coordinator.

**Miscellaneous**

This Agreement constitutes the entire understanding between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral.

**Amendment Clause**

This Agreement may be amended or modified only by a written instrument executed by both parties hereto. Any proposed amendments shall be presented in writing to the other party, specifying the proposed changes and the rationale behind them. Both parties shall engage in good faith negotiations to reach mutual agreement on any amendments. Amendments shall only be deemed valid and enforceable if executed in writing by both parties. No oral agreements or understandings shall modify the terms of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

_____    JEFF LINDSAY    4-12-2024
Employer Signature                Employer Print Name           Date

_____    Camenon Jean Stangel    4/12/2024
Travel Coordinator Signature     Travel Coordinator Print Name    Date

_____    Beau Reichert    4/12/2024
Witness Signature                Witness Print Name            Date