**Silence Law Group PLLC**
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024
**Jeffrey Silence** (029143)
Direct Dial: (602) 932-8358
Email: jeff@silencelaw.com
**Trevor Cook** (037952)
Direct Dial: (602) 932-5868
Email: trevor@silencelaw.com

**Shields Petitti & Zoldan, PLC**
**James Burr Shields**
Direct Dial : (602) 718-3331
Email: burr@shieldspetitti.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cameron Stangel,<br><br>   Plaintiff,<br><br>v.<br><br>Jeffery Lindsay,<br><br>   Defendant. | Case No. CV-25-471-JCH<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT LINDSAY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>(Oral Argument Requested)<br><br>(Hon. John C. Hinderaker) |

**I.     Introduction**

This case arises out of the abuse of an Arizona employment agreement negotiated, executed, and performed in Arizona. Stangel did not ask for the property located at 6 Naco Road in Bisbee (the "Property"). Nor did Stangel seek the position of Defendant Jeffery Lindsay's "travel coordinator." Instead, Lindsay purchased the Property in Arizona, negotiated and executed an employment agreement to employ Stangel as his employee (the "Employment Agreement"), and arranged for Stangel to live in the Arizona property during her employment. Lindsay was well aware that when they were not traveling,

1  Stangel was living and working in the Property with her partner. Lindsay availed himself
2  of the protections of Arizona law and directed his tortious activities to Arizona by
3  purchasing the Property in Arizona, moving Stangel there, and employing Stangel to
4  perform a substantial portion of her job duties while living in the Property in Arizona.

5  To support his Motion to Dismiss the First Amended Complaint ("Motion"),
6  Lindsay relies on assertions that Stangel and Lindsay negotiated the Employment
7  Agreement in Texas and that Stangel lives and works in Texas. But he points to no
8  allegations in the Complaint and provides no evidence by affidavit or otherwise to support
9  those critical assertions. The Court, therefore, should disregard them.

## II.  Facts

Stangel and her partner Beau Reichert had traveled the country for years to find a home for their planned nonprofit photography foundation. Ex. A at 1 ¶¶ 3–4. They discovered the Property in 2022. *Id.* ¶¶ 5–7; Ex. B. at 1 ¶ 3; FAC at 2 ¶ 6. The property fit their plans perfectly because it had sufficient space to store and operate an extensive collection of photographic equipment, a finished living space, proper zoning for both living and operating their foundation, and a scenic location with a thriving local and regional arts scene. Ex. A at 1 ¶ 7; Ex. B at 1 ¶ 3. They did not have the cash to purchase the property but began making plans to acquire it. Ex. A at 2 ¶¶ 8–10; Ex. B at 1 ¶ 4; FAC at 2 ¶¶ 7–12.

Stangel and Lindsay first met at an antiques show in 2023. FAC at 2–3 ¶¶ 12–15; Ex. A at 2 ¶¶ 10–11; Ex. B at 1 ¶ 5. From the start, Lindsay expressed interest in Stangel and Reichart's plans to obtain the Property and establish their foundation; he offered to help if he could. FAC at 3 ¶ 17; Ex. A at 2–3 ¶¶ 11–12; Ex. B at 1 ¶ 5. Stangel and Lindsay communicated off and on for about six months, after which Lindsay pitched the idea to Stangel that he would hire her to assist him with travel plans in return for the Property. FAC at 3 ¶ 23; Ex. A at 2–3 ¶¶ 12–13.  Stangel was surprised at Lindsay's seeming generosity—she figured he was motivated in part by her and Reichart's nonprofit plans for the Property and a desire to be philanthropic. Ex. A at 3 ¶ 14.

2

1       Stangel connected Lindsay with the realtor to commence the purchase process. *Id.* at 3 ¶ 15. Stangel and Lindsay planned to meet in Bisbee to finalize and execute their employment agreement. *Id.* Stangel arrived in Bisbee on April 10, 2024; Lindsay, the following day. *Id.* at 3 ¶ 16. Stangel and Reichert stayed at the Property and Lindsay at an Airbnb rental. *Id.* For two days, Stangel and Lindsay were constantly on the phone—and met a couple times in person—to negotiate the terms of their employment agreement. *Id.* at 3–4 ¶¶ 17–22; Ex. B at 2 ¶¶ 9–11. Stangel drafted a written agreement and revised it many times as she and Lindsay negotiated. Ex. A at 4 ¶ 21. The parties signed the final version (the "Employment Agreement") before a notary on April 12, 2024. *Id.* at 5 ¶ 23.

      The Employment Agreement provided that Lindsay would transfer title of the Property to Stangel after three years or 520 days of Stangel performing work as Lindsay's travel coordinator. Mot. Ex. A at 1 [Doc. 8-1 at 3] ("Services Detail"). The travel coordinator work would be performed either during travels or while Stangel was at "home," which Stangel believed referenced the Property because the parties agreed when signing the Employment Agreement that Stangel and Reichart would lease the Property during her employment. *Id.* at 1 ("home"); Ex. A at 4 ¶ 20, 5 ¶ 25.

      A few days later, Lindsay called Stangel and asked her to draft a lease agreement for the Property ("Lease Agreement"), insisting that only Reichert sign it as tenant. Ex. A at 5 ¶ 24. Lindsay did not explain why he insisted that only Reichart sign the Lease Agreement. *Id.*

      It is clear from the terms of the Employment Agreement and Lease Agreement that the offer to lease the Property to Reichart was directly tied to Stangel's employment. For example, the Employment Agreement provided for a term of employment commencing on April 12, 2024, and automatically terminating no later than April 10, 2027. Mot. Ex. A at 1. The Lease Agreement likewise provided a term of April 12, 2024, to April 9, 2027, one day before the automatic termination date of the Employment Agreement. Ex. A-2 at 1.

1  In addition, the Employment Agreement provided that Stangel would pay for the
2 taxes and insurance on the Property during her employment, Mot. Ex. A at 1
3 ("Compensation Detail"). The Lease Agreement likewise provided that the tenant would
4 pay for the same, Ex. A-1 at 1. In accord with the Parties' plans, Reichert moved his and
5 Stangel's household from Texas into the Property in May 2024, after close of escrow. Ex.
6 A at 5 ¶ 25; Ex. B at 3 ¶ 13. When she was not traveling with Lindsay, Stangel performed
7 her travel-planning job duties while living in the Property with Reichart. Ex. A at 5 ¶ 25
8 Since being terminated, Stangel continues to live in the Property with Reichart. Ex. A at
9 5–7 ¶¶ 25–37. Since she moved to Bisbee in May 2024, Stangel has only returned to Texas
10 twice for brief visits. *Id.* at 7 ¶ 32. Lindsay knows Stangel has resided at the Property since
11 shortly after the execution of the Employment Agreement and that she continues to reside
12 there. FAC at 4 ¶ 32, 10–11 ¶¶ 122–25; Ex. A at 3 ¶ 16, 5–6 ¶¶ 24–31. Indeed, Lindsay
13 has unsuccessfully sought to evict Stangel and Reichart from the Property. FAC at 11
14 ¶¶ 124–25.

### III.   Argument

This Court has specific jurisdiction over Lindsay because he both purposefully availed himself of the privilege of conducting business in Arizona and committed intentional acts expressly aimed at Arizona that caused harm he knew would be suffered in Arizona. The First Amended Complaint (FAC) and attached declarations make a prima facie showing to support this Court's exercise of specific jurisdiction over Lindsay.

#### A.   Standard for Showing Specific Jurisdiction

Federal courts in the District of Arizona may generally exercise personal jurisdiction over non-resident defendants to the extent allowed by the United States Constitution. *See* Fed. R. Civ. P. 4(e), (k); *Walden v. Fiore*, 571 U.S. 277, 283 (2014); Ariz. R. Civ. P. 4.2. The Constitution allows the Court to exercise "specific jurisdiction" over nonresident defendants when the issues to be adjudicated derive from or are connected with the controversy establishing jurisdiction. *See Bristol-Myers Squibb Co. v.*

4

*Sup. Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). The Ninth Circuit has established a three-part analysis to determine whether a court has specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The Court may also assert pendent personal jurisdiction with respect to any claim without its own independent basis for personal jurisdiction if it arises out of a common nucleus of operative fact with a claim in the same suit over which the court has personal jurisdiction. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180–81 (9th Cir. 2004).

Plaintiff must make a showing of the first two elements. *Schwarzenegger*, 374 F.3d at 802. The burden then shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). To withstand a motion to dismiss without an evidentiary hearing, Plaintiff "need make only a prima facie showing of jurisdictional facts." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). The Court must take as true uncontroverted allegations in the complaint and resolve "[c]onflict between parties over statements contained in affidavits" in the plaintiff's favor. *Schwarzenegger*, 374 F.3d at 802.

### 1. "Purposeful Availment" and "Purposeful Direction"

To satisfy the first element of the test, the defendant must "purposefully direct its activities toward the forum state [the "purposeful direction" test], purposefully avail itself of the privileges of conducting activities there [the "purposeful availment" test], or engage

1  in some combination thereof." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023). The purposeful availment test is often better for analyzing contract claims and the purposeful direction test for tort claims. *Id.* But there is no "hard-and-fast rule" for applying the tests or a "rigid dividing line" between the two types of claims. *Davis v. Cranefield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (2023). Courts have applied both tests when presented with mixed claim types and have used the purposeful availment test when tort claims arose out of the contractual relationship between plaintiff and defendant. *See Picot v. Weston*, 780 F.3d 1206, 1212 (2015) (explaining both tests are at issue because plaintiff asserts both contract and tort claims); *Plintron Techs. USA LLC v. Phillips*, No. 2:24-cv-00093, 2025 WL 2223438, at *3 (W.D. Wash. Aug. 5, 2025) (employing purposeful availment analysis for both contract and tort claims because the claims "sound in contract or otherwise 'arise out of [plaintiff's] contractual relationship with the defendants.'") (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)).

Relying on *Morrill v. Scott Financial Corp.*, 873 F.3d 1136 (9th Cir. 2017), Lindsay wrongly argues that the Court must choose between the tests and that it must choose purposeful direction because Plaintiff's contract claims are premised on Lindsay's tortious conduct. Mot. at 8:15-9:14. But *Morrill* did not involve contract claims, and the Court may apply either or both tests to Plaintiff's mixed claims. *See Picot*, 780 F.3d at 1212 (applying both tests to mixed claims); *Plintron*, 2025 WL at *3 (employing purposeful availment for both contract and tort claims).

The Court may solely apply the purposeful availment test because Plaintiff brings a contract claim (Count One), Plaintiff's statutory claims (Counts Two through Four) arise out of the contractual employer-employee relationship, and Plaintiff's tort claims (Counts Five and Six)[1] arise out of the parties' Employment Agreement: Lindsay committed the torts on work trips where he isolated Plaintiff in foreign countries to pressure her for sexual favors. *See* FAC at 3–4 ¶¶ 26–33 (agreement terms) 5–10 ¶¶ 43–115 (enabling tortious

---

[1] Contrary to Defendant's assertion, *see* Mot. at 9:11–12, unjust enrichment is not a tort.

6

acts). Regardless of which test is applied, Plaintiff makes the requisite prima facie showing of jurisdictional facts under both the purposeful availment and purposeful direction tests.

### B. Lindsay Purposely Availed Himself of the Privileges of Conducting Business in Arizona.

A contract alone does not establish the minimum contacts sufficient for specific jurisdiction. *See Picot*, 780 F.3d at 1212. The defendant himself must create a substantial connection with the forum state; courts determining whether such contacts exist consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (quoting *Burger King*, 471 U.S. at 479). The Supreme Court explained that parties who "reach out beyond" their state to "create continuing relationships and obligations with citizens of another state" are subject to the other state's regulation and sanctions. *Burger King*, 471 U.S. at 473. Those parties may not wield the Due Process Clause "as a territorial shield" to avoid those voluntarily assumed interstate obligations. *Id.* at 474.

The parties materially negotiated the Employment Agreement and executed it in Arizona. Ex. A at 3–5 ¶¶ 16–23; Ex. B at 2–3 ¶¶ 8–11. While negotiating the Employment Agreement, Lindsay knew and intended that Stangel would reside in Arizona at the Property. *See* FAC at 4 ¶ 32; Ex. A at 2 ¶ 12, 3 ¶ 16, 4 ¶ 20, 5–6 ¶¶ 24–31. Even before they executed the Employment Agreement, Stangel texted Lindsay that she was "home" when she arrived at the Property. Ex. A at 3 ¶ 16. In response, Lindsay asked Stangel to confirm whether it felt "right" and "good." *Id.* Although Lindsay for some reason insisted that only Reichert sign the Lease Agreement, *Id.* at 5 ¶ 24, its nearly complete overlap with the term of the Employment Agreement and its provision—mirroring the Employment Agreement—that the tenant pay the insurance premiums for and taxes on the Property, *see* FAC at 3–4 ¶¶ 26–32; Mot. Ex A at 1 (Employment Agreement); Ex. A-1 at 1 (Lease Agreement), reflect the parties' intent that Stangel work at, and reside at, the Property throughout her employment as Lindsay's travel coordinator.

1    Lindsay did not merely "reach out beyond" Texas to create a continuing obligation
2 with an Arizona resident. He purchased the Property in Arizona for the purpose of
3 developing a continuing employment relationship with Stangel with the understanding that
4 she would live at and work from the Property when she was not traveling with him.
5 Because of Lindsay's purposeful actions, Stangel became an Arizona resident.

6    Lindsay and Stangel talked about her being at the Property in Bisbee. Ex. A at 5–6
7 ¶¶ 26–29. As explicitly contemplated in the Employment Agreement, Mot. Ex. A at 1,
8 Stangel worked as Lindsay's travel coordinator in part from home in Arizona, Ex. A at 5
9 ¶ 25. Stangel departed to work trips from and returned home to Bisbee, as reflected in her
10 conversations with and expense reimbursements submitted to Lindsay. Ex. A at 5 ¶¶ 26–
11 29 (conversations), 6 ¶¶ 30–31 (reimbursements).

12    The Arizona negotiations, the parties' contemplation of Stangel's Arizona
13 residence, the terms of the Employment Agreement and its associated Lease Agreement
14 providing for Stangel's residence at the Property, and the parties' course of dealing are all
15 minimum contacts purposely created by Lindsay and sufficient for this Court's personal
16 jurisdiction over him for these claims.

17    **C.    Lindsay Purposely Directed His Actions to Arizona.**

18    There are sufficient minimum contacts under the purposeful-direction test. Courts
19 consider three elements to determine "purposeful direction": 1) defendant committed an
20 intentional act 2) expressly aimed at the forum state, and 3) harm resulted that the
21 defendant knew was likely to be suffered in the forum state. *Schwarzenegger*, 374 F.3d at
22 806 (citations omitted). Lindsay's acts toward Stangel were not "random, fortuitous or
23 attenuated." He purposefully engaged in conduct aimed at Arizona calculated to secure
24 Stangel's company and employment. Jurisdiction is proper because Lindsay's conduct
25 was intended to and did result in harmful effects in Arizona. Lindsay was not an "angel"
26 donor or investor trying to help Stangel and Reichert achieve their nonprofit goals. He
27 knew Stangel wanted to be in Bisbee at the Property. FAC at 2–3 ¶¶ 13–17; Ex. A at 2
28 ¶¶ 10–12. He exploited that knowledge and purchased the Property to target Stangel for

8

the gratification of his sexual desires. FAC at 3–4 ¶ 23–32 (offering position and purchasing Property), 5–10 ¶¶ 45–120 (exploiting the situation).

### 1. Lindsay's Actions Were Intentional.

An "intentional act" is any act done with the 'intent to perform an actual, physical act in the real world.'" *Picot*, at 1214 (quoting *Schwarzenegger*, 374 F.3d at 806).

Here, Lindsay intentionally purchased the Property in Arizona, flew to Arizona to meet with Plaintiff and her partner, negotiated the contract with Plaintiff in Arizona, agreed Plaintiff and her partner would live at the Property, and agreed the Employment Agreement would be partially performed in Arizona when Stangel was not traveling. Lindsay intentionally breached the contract, violated his obligations to her as her employer, trafficked her, and intentionally inflicted emotional distress on her.

### 2. Lindsay Expressly Aimed His Conduct at Arizona.

A court's analysis of whether acts are "expressly aimed at the forum" depends on "the specific type of tort or wrongful conduct at issue." *Picot*, 780 F.3d at 1214 (citation omitted). But, in any case, the "aiming" relationship must "arise out of contacts that the defendant *himself* creates with the forum State," and the analysis "looks to the defendant's contacts with the forum State" and not "with persons who reside there." *Morill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143 (9th Cir. 2017). Here, Stangel alleges torts of federal sex trafficking and intentional infliction of emotional distress,[2] breach of contract, failure to pay Arizona minimum wage and sick time, and wrongful termination,

Lindsay aimed his breach of contract at Arizona by inducing Stangel to move from Texas to live and work for him in Arizona. Lindsay then failed to pay sick time and minimum wage and wrongfully terminated Stangel in violation of Arizona law.

Lindsay's sex-trafficking and intentional infliction of emotional distress were also aimed at Arizona. He lured Stangel to travel outside the United States so that she would be dependent on him. During her employment, Lindsay deliberately targeted Stangel, who

---

[2] Stangel pleads unjust enrichment in the alternative to the breach of contract claim in case no contract is found to govern her contract and statutory employment claims.

9

1  he knew was living in the Property and had become an Arizona resident. *See* FAC at 4
2  ¶ 32, 11 ¶¶ 124–25; Ex. A at 4 ¶ 20, 5–6 ¶¶ 24–31.

### 3. Lindsay Knew Stangel Would Suffer Harm in Arizona.

Since the Supreme Court decided *Walden v. Fiore*, 571 U.S. 277 (2014), the Ninth Circuit has clarified that "mere injury to a forum resident is not a sufficient connection to the forum" and that "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Picot*, 780 F.3d at 1214 (quoting *Walden*, 571 U.S. at 289–90).

The courts did not find specific jurisdiction in *Walden* or *Morrill* because "the forum state was only implicated by the happenstance of Plaintiffs' residence." *Morrill*, 873 F.3d at 1146. The *Walden* plaintiffs would have felt the same injury "wherever else they might have traveled," *Walden*, 571 U.S. at 290, and the *Morrill* plaintiffs would have experienced the same alleged tortious conduct if they had lived anywhere else. *Morrill*, 873 F.3d at 1146.

But Stangel's residence in Arizona was not "happenstance." It was the result Lindsay intended by his buying the Property, negotiating and executing the Employment Agreement and Lease Agreement, and employing Stangel as his travel coordinator knowing she would be living in and working from the Property. Lindsay did not just know Stangel would suffer harm in Arizona; he caused her to move to and reside in Arizona in his Property. These circumstances are sufficient to meet this element.

### D. Stangel's Claims Arise Out of Lindsay's Forum-Related Activities

A "lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996). The Ninth Circuit applies a "but for" test to determine, for specific jurisdiction, whether a particular claim arises out of forum-related conduct. *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007). So, Stangel must show she would not have suffered her injuries "but for" Lindsay's forum-related conduct. *See id.*

Stangel would not have suffered her injuries alleged in the FAC but for Lindsay acquiring the Property in Arizona, persuading and enabling Stangel to take up residence there, and entering into the Employment Agreement with her knowing and intending that she would be an Arizona resident. Lindsay performed some of his tortious acts outside of Arizona, but he would not have been in a position of power and control to commit those acts but for the Employment Agreement that required Stangel to travel with him.

The undisputed portions of Plaintiff's FAC[3] together with her sworn declarations are sufficient for this Court to find that Plaintiff has made the prima facie showing of jurisdictional facts for specific jurisdiction. The Court should disregard the Motion's bare statements contradicting Plaintiff's sworn declarations because it must take all uncontroverted allegations in the FAC as true and resolve all conflict between the parties' statements contained in affidavits in the Plaintiff's favor. In any case, statements by attorneys in briefs are not evidence. Because Lindsay does not present a "compelling case that the exercise of jurisdiction would not be reasonable," *see Schwarzenegger*, 374 F.3d at 802, the Court should deny his Motion.

### E. Fair Play and Substantial Justice Support Specific Jurisdiction

The third prong of the minimum contacts test for specific jurisdiction requires that the exercise of jurisdiction be reasonable, meaning "it comports with 'fair play and substantial justice.'" *See Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1487 (9th Cir. 1993) (quoting *Burger King*, 471 U.S. at 476–77). But the burden is on the defendant to show jurisdiction is unreasonable. *See id.* In evaluating reasonableness, courts consider seven factors: 1) the extent of defendant's purposeful interjection in the forum; 2) the burden on defendant in defending in the forum; 3) the extent of conflict with the sovereignty of the defendant's state; 4) the forum state's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the controversy; 6) the importance of

---

[3] Stangel has filed a motion for leave to amend pending with the Court. Doc. 12. Her proposed Second Amended Complaint, Doc. 12-1, adds retaliation claims and alleges supporting facts that further support this Court's exercise of specific jurisdiction over Lindsay.

11

1  the forum to plaintiff's interest in convenient and effective relief; and 7) the existence of
2  an alternative forum. *Panavision*, 938 F. Supp. at 622 (citing *Burger King*, 471 U.S. at
3  476-477). "No one factor is dispositive: the court must balance all seven" factors. *Id*.

4        Lindsay's Motion does not squarely address these seven factors. *See* Mot. at 13:6-
5  15:2. The arguments he does make fail to carry his burden of proving that exercising
6  jurisdiction over Stangel's claims would be unreasonable.

7        First, Lindsay's attorney asserts that "Ms. Stangel[4] . . . own[s] real property in
8  Texas, work[s] there, and seek[s] to continue working there," citing paragraph 126 of the
9  FAC and Exhibits B–D of the Motion. Mot. at 13:14–16. But only Exhibit D to the Motion
10 includes a text message apparently from Stangel to Lindsay referring to a Texas property
11 "we" have for sale. Mot. Ex. D. It is unclear how this text is relevant, let alone sufficient
12 to satisfy Lindsay's burden of proof.

13       The remainder of Exhibit D and Exhibits B–C do not even mention Stangel, let
14 alone support the assertions that she owns real property in Texas, works there, or seeks to
15 continue working there. To the contrary, according to her own admissible statements filed
16 with this Response, she does **not** work in Texas. Ex. A at 7 ¶ 33. Stangel wants to work
17 primarily in Arizona for her and Reichert's nonprofit foundation. *Id.* Paragraph 126 of the
18 FAC only alleges that Stangel wants to continue renting booth space "at the twice-yearly
19 Round Top Antique Shows," hardly justifying the assertion that she seeks to continue
20 "working" in Texas.

21       Second, Lindsay asserts that a Texas forum "should pose no burden to Ms. Stangel
22 as she . . . need not cross state lines to attend court from Plaintiffs [sic] residence at the
23 Sekrit Theater, which is just minutes away from the Western District of Texas District
24 Court," citing the same FAC paragraph and Motion exhibits. Mot. at 13:18–20. Third,
25 Lindsay further asserts "there is little to no inconvenience to Ms. Stangel to litigate in
26 Texas given her stated willingness and desire to go there, Mot. at 13:21–22. But none of

---

[4] The Motion also makes assertions about Reichert, but Reichert is not the Plaintiff, so Stangel does not address Lindsay's counsel's irrelevant factual assertions about Reichert.

12

the cited exhibits or FAC paragraph support that Stangel's "residence" is at the Sekrit Theater. Stangel has been residing at the Property in Bisbee almost since the execution of the Employment Agreement. Ex. A at 1 ¶ 2, 5 ¶ 25.

Fourth, Lindsay argues that a Texas forum would provide the most efficient judicial resolution. Mot. at 2–9. Lindsay asserts that all the witnesses he would proffer are not Arizona residents, but nor are they all Texas residents. Mot. at 14:4–9. Contrary to Lindsay's attorney's unsupported claim that Stangel is "admittedly [a] Texas resident[] but claim[s] to live in Bisbee," Stangel is a resident of Bisbee. Ex. A at 1 ¶ 2.

Regardless, the Ninth Circuit recognized the factor of judicial economy as "discounted" because of "modern advances" in communication and transportation. *Caruth v. Internat'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995). This court has cited *Caruth* to find this factor weighing in favor of its jurisdiction when, as here, the defendant was located in another state but the plaintiff and the work performed under the contract were in Arizona. *See BCS & Associates Bus. Consulting Servs., Inc. v Essential Health*, No. CV09-00814-PHX-MHM, 2010 WL 1253186, at *6 (D. Ariz. March 25, 2010).

Lindsay asserts, fifth, that "Texas has the biggest dog in the fight of state interests" related to the Employment Agreement, Mot. at 13:10–13, and, seventh, that "Arizona has virtually no interest in this suit, *id.* at 13:20. That is not true—"states have a strong incentive in providing their citizens with an effective means of redress from tort." *Marlyn Nutraceuticals, Inc. v. Improvita Health Products*, 663 F. Supp. 2d 841, 854 (D. Ariz. 2009). The Employment Agreement was negotiated and executed in Arizona, with both parties knowing Stangel would live at and work from the Property. *See* Sections II and III.B and .C, above.

Sixth, Lindsay contorts the facts of *Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986) into a failed analogy attempting to minimize Lindsay's purposeful interjection into Arizona. Mot. at 14:13–19. In *Brand*, the defendant sold a vehicle to a dealer who indicated he would resell the vehicle in the alleged forum state. *Brand*, 796 F.2d at 1075. Not only does this case not involve the sale of a product into Arizona or

13

Stangel's resale of it, but Lindsay's assertion that the *Brand* court is "noting that [plaintiff's] purposeful interjection was limited when a seller merely sold a product to a buyer who indicated he would resell in the forum," Mot. at 14:16–17, is wrong. Rather, the court held that the facts of the sale did not create a *presumption* of reasonableness of jurisdiction in the alleged forum-state's courts and that "personal jurisdiction may [*still*] be established on a lesser showing of minimum contacts with the state if considerations of reasonableness"—which include the consideration of purposeful interjection—"dictate." *Brand*, 796 F.2d at 1075.

Lindsay purposefully interjected himself into Arizona when he bought the Property solely to provide it as compensation to Stangel to induce her to enter into an Employment Agreement that would compel her as an Arizona resident to spend time with him and give him the opportunity to pressure her for sexual favors. Stangel did not "pick" the Property. *See* Mot. at 14:14–15; FAC at 3 ¶ 23 (Lindsay offered); Ex. A at 2–3 ¶ 13 (Lindsay proposed). Lindsay knew that Stangel wanted to live at and run a non-profit out of the Property; that is why he bought the Property and offered in the Employment Agreement to compensate her with the Property. FAC at 2–3 ¶¶ 13–23; Ex. A at 2–3 ¶¶ 2–16.[5]

To the extent that Lindsay addresses the seven reasonableness factors, he fails to carry his burden to show that this Court's exercise of jurisdiction would be unreasonable. The Court should, therefore, deny his Motion to Dismiss. The Court should also deny Lindsay's request for leave to supplement his reasonableness argument because he offers neither legal authority for granting the request nor any explanation why he did not in his Motion fully address each of the seven factors the Court must consider to determine the reasonableness of exercising specific jurisdiction over him.

---

[5] Lindsay continues to interject himself into the forum by recently conducting a retaliatory "inspection" of the Property through his counsel in this action and by maintaining a retaliatory appeal of the dismissal of his eviction action against Stangel. *See* Mot. Leave to Amend Doc. 12; Proposed Second Amended Complaint Doc. 12-1.

### F. Venue is Proper in the District of Arizona

"A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2). Lindsay asserts that "Texas is where the most substantial part of the events giving rise to the claims occurred" because "[t]he parties signed the [Employment Agreement] as Texans (where Plaintiff still seeks to travel, work, and owns property), Texas is where the parties negotiated the [Employment Agreement] for services provided in Texas, paid for in Texas, and where the bulk of the relevant witnesses are located." Mot. at 15:24–16:2. But, as already described, the parties executed the Employment Agreement contemplating Stangel's residence and performance of the contract in Bisbee. *See* Sections I and II.B, and .C, above. They negotiated and executed the Employment Agreement in Arizona. *See id.* Stangel's services were provided in and from Arizona. *See id.* All these events, including Lindsay's purchase of the Property to provide it as compensation for Stangel and his inducement of her to reside in Arizona and enter the Employment Agreement, are "a substantial part of the events or omissions giving rise to the claim" that occurred in Arizona and therefore make venue proper under 28 U.S.C. § 1391(b)(2).

### G. Defendant's Failure to State a Claim Fails as a Matter of Arizona Law

Lindsay's Rule 12(b)(6) Motion fails because there was no "Texas" Contract, only an embryonic Texas idea that was born and grew up in Arizona to become the Arizona Employment Agreement. Texas was only the location of the parties' first meeting and where Lindsay first proposed the idea of Stangel being his travel coordinator. The facts show Arizona as the location where the contract was negotiated and executed. The facts show the Employment Agreement was intended to be performed in Arizona and while traveling abroad. Ironically, Lindsay acknowledges that when the place of negotiating the contract and the place of performance are in the same state, as they are here, that state's laws control. Motion, 16:15-25.

Absent from Lindsay's Motion is any discussion of Arizona employment law, out of which Stangel's three statutory claims arise, FAC Counts Two through Four. The

Arizona Minimum Wage and Earned Paid Sick Time statutes require that Arizona employees receive minimum compensation and paid time off for qualifying reasons. As relevant here, the statutes define "employee" as "any person who is or was employed by an employer" and an "employer" as any "individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee." A.R.S. § 23-362 (definitions in minimum wage statute); A.R.S. § 23-371 (incorporating by reference minimum wage statute definitions).

The Employment Agreement specifically provided that Stangel was to work from "home" when not traveling with Lindsay. Ex. A-X at 1. Her home, as Lindsay knew, was the Property. Because the Employment Agreement was to be performed while at "home" in Arizona, Arizona law governs the employment relationship. The Court should therefore deny Defendant's request to dismiss the FAC's statutory claims.

### H. Plaintiff, Not Defendant, Should Be Awarded Attorney's Fees and Costs

Lindsay seeks costs and fees pursuant to 28 U.S.C. § 1927, which provides that "[a]ny attorney or other person admitted to conduct cases" in federal court and "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Defending against a motion to dismiss is not an act of multiplying proceedings unreasonably and vexatiously. Lindsay's Motion, on the other hand, critically relies on counsel's assertions, made without any supporting evidence, that Stangel's residence is in Texas and that she "lives and works" there. Lindsay's counsel's signing that motion in the face of voluminous evidence that Lindsay intended all along for Stangel to reside in the Property and knows that she has resided there almost since the execution of the Employment Agreement—including counsel's own open-court acknowledgment of Stangel's living in the Property in the Eviction Action, *see* Ex. C (hearing transcript excerpts)—suggests that they either did not make reasonable inquiry about the factual

contentions they are making or are presenting them for an improper purpose. *See* Fed. R. Civ. P. 11(b)(1) and (3).

Although Stangel's counsel believes that Lindsay's counsel's certification of their Motion containing those baseless representations violates Federal Rule of Civil Procedure 11(b)(1) and (3), Stangel has declined to seek Rule 11 sanctions. Nevertheless, Stangel's counsel is troubled by these representations made to the Court.

### IV. Conclusion

The Court should deny the Motion to Dismiss in its entirety.

RESPECTFULLY SUBMITTED this 30th day of December, 2025.

**Silence Law Group PLLC**

*/S/ Trevor Cook*
Trevor Cook
Jeffrey Silence
James Burr Shields
*Attorneys for Plaintiff*