**BURRIS & MACOMBER, PLLC**
2478 East River Road
Tucson, Arizona 85718
Telephone:    (520) 775-2000
Facsimile:    (520) 775-2001

**D. Rob Burris, Esq.**
State Bar No. 024961
Email: rob@burrismacomber.com

**Jeremy T. Shorbe**
State Bar No. 026920
Email: jeremy@burrismacomber.com
*Attorneys for Defendant Jeffrey Lindsay*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cameron Stangel, | Case No. CV-25-471-JCH |
| Plaintiff, | |
| v. | **REPLY TO MS. STANGEL'S OPPOSITION TO DEFENDANT JEFFERY LINDSAY'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| Jeffery Lindsay, | |
| Defendant. | Hon. John C. Hinderaker |

Defendant Jeffery Lindsay ("<u>Defendant</u>" or "<u>Mr. Lindsay</u>") hereby submits his Reply (the "<u>Reply</u>") to Plaintiff's Opposition (the "<u>Opposition</u>") to Mr. Lindsay's Motion to Dismiss (the "<u>MTD</u>") the First Amended Complaint ("<u>1AC</u>").

## I.    <u>INTRODUCTION.</u>

One day in Bisbee—Arizona jurisdiction does not make (the unpermitted, pending 2AC allegations notwithstanding). Ms. Stangel expects the lone day in Bisbee to close on the already-negotiated Texas Contract to outweigh all of the other contacts outside of Arizona (but primarily with Texas), even while her own admissions show insufficient Arizona contacts required for jurisdiction. She pits that lone day meeting in Bisbee (the "<u>Bisbee Trip</u>") on April 12, 2024, against the established-as-alleged facts that: (1) both parties lived and worked in Texas prior to, and after, the April 12th signing; (2) Ms. Stangel

still does work—and desires to continue working—in Texas at the Sekrit Theater listed as her Texas residence; (3) the Parties negotiated the Texas Contract almost wholly in Texas (per the 1AC ¶ 23—April 3, 2024, offer of Texas Contract prior to the Bisbee Trip), with only execution linking Mr. Lindsay to Bisbee; (4) The Texas Contract was only directed at Mr. Lindsay in Texas for services to be provided around the world travelling (anywhere but Arizona); (5) both Parties signed the Texas Contract in their capacities as Texas residents; (6) Plaintiff directed all of her communications to Mr. Lindsay in Texas; (7) All expenses were paid from Texas; (8) there are zero Arizona real estate claims in the 1AC; and (9) all potential witnesses are in Texas or outside of Arizona. *MtD (Doc. 8), at p. 9:20 to 11:1.*

Similarly, all the Court has to do to see that none of the alleged (and completely fabricated) "bad conduct" occurred in, or at, Arizona is look at the verbs Ms. Stangel uses to describe alleged conduct aimed at, or happening in, Arizona. The ***only*** conduct even alleged to have occurred in Arizona (or "at" Arizona) were allegations that Mr. Lindsay: "Met" (*1AC, ¶ 24*), "purchased" (*1AC, ¶ 25*), and "executed" (*1AC, ¶ 26*). But—even taking the 1AC as true—none of the alleged "***bad*** conduct" includes any Arizona "meeting," "purchasing," or "executing," as required by *Morrill*. *Morrill* requires that the "***challenged*** conduct" must be the basis of the acts substantiating jurisdiction as applied to both tort (purposeful direction test) and contract claims (purposeful availment test). Mr. Lindsay's alleged "Purchasing" is not a tort or violative of the Texas Contract; neither is his alleged "meeting" to "execute" the Texas Contract. Therefore, this case must be dismissed for lack of jurisdiction as a matter of the law requiring that the "bad acts," ***themselves***, occur at/in Arizona to create jurisdiction.

Next, Ms. Stangel cannot conflate the April 15, 2024, three-year lease of the Property between Mr. Reichert (sole tenant signatory) and Mr. Lindsay (as landlord) (the "Lease") with the April 12, 2024, Texas Contract. Aside from being judicially estopped to argue that the two are one document, the two documents create wholly separate rights that would be

1  enforceable by Mr. Reichert as against Ms. Stangel (and vice-versa) if she succeeded to

2  ownership of the Property prior to the termination of the Lease. The 1AC, and Ms. Stangel's

3  subsequent filings, establish as an irrefutable fact that neither contract gave her any right to

4  occupy the Property, and therefore, no action against the wholly separate tenant's possessory

5  rights can be considered an impingement of Ms. Stangel's non-existent possessory rights.

6  **II.**    **THE 1AC AND BRIEFING SHOW THAT THE PARTIES NEGOTIATED AND PERFORMED THE CONTRACT OUTSIDE OF ARIZONA AND PRIMARILY IN TEXAS.**

7
   A.  *The Texas Contract, Itself, Expressly Lists the Parties to Be Signing as Residents of*
8      *the State of Texas*.

9       The Texas Contract, as drafted by Ms. Stangel, lists the bound Parties as residents of

10  the state of Texas. *Exhibit A to 1AC (Doc. 1-2)*. These addresses were to govern notices and

11  to identify exactly who the Parties were, which can only mean they both considered

12  themselves residents of Texas contracting for the provision of services. *Id*. This is

13  conclusive evidence that the Parties entered the contract with the express understanding that

14  Ms. Stangel was a resident of Austin, Texas at the Sekrit Theater and the Court must give

15  this fact extreme weight. *Id*. (listing Ms. Stangel's residence as the Sekrit Theater).

16       The *Erie Doctrine* instructs this Court to apply Arizona contract law to

17  interpretations of contracts. *See Erie RR. Co. v. Tompkins*, 304 U.S. 64, 79 (U.S. 1938). In

18  Arizona, the rule of contract construction is that ambiguity is construed against the drafter.

19  *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d 660, 662 (Ariz. 1975).

20       Here, Ms. Stangel admits to drafting the Texas Contract. *Opposition (Doc. 13), at p.*

21  *3:7* ("[Ms.] Stangel drafted a written agreement and revised it[.]"). Therefore, any

22  ambiguity—as to whether the Parties' statement of residency is conclusive proof that they

23  were both signing as Texans—must be construed against Ms. Stangel. This leaves the lone

24  conclusion that the Texas Contract, itself, decisively closes the inquiry into the residency

25  of the Parties and definitively establishes the Parties as residents of Texas.

26  
   B.  *Ms. Stangel Admits in the 1AC and in the Opposition that the Texas Contract was*
       *Primarily Negotiated in Texas, and the Bisbee Trip Was Just for Signing*.

1    The 1AC[1] ***admits*** that the Parties negotiated the Texas Contract in Texas, ***months***

2   ***prior*** to the day they met in Bisbee to sign the completed contracts. *1AC (Doc. 6)* at ¶ 17

3   (the parties discuss the purchase of the Property in Texas prior to the Bisbee trip); *¶¶19-*

4   *22* (the parties spent hours discussing the acquisition of the Property in Texas prior to the

5   Bisbee Trip); *¶ 23* (Mr. Lindsay made the negotiated offer to purchase Ms. Stangel's

6   services, prior to the Bisbee Trip, while both were in Texas, not Arizona, on April 3, 2024);

7   *¶¶ 24-26* (the parties met, for one day in Bisbee on April 12, 2024, to sign the already

8   negotiated Texas Contract). Furthermore, Ms. Stangel drafted the contract. *Opposition*

9   *(Doc. 13) at p. 3:7-8* ("[Ms.] Stangel drafted [the Texas Contract] and revised it many

10  times[.]").

11   Ms. Stangel ***admits*** in her Opposition that the parties pre-negotiated the Texas

12  Contract in Texas and just met in Arizona to sign. *Opposition (Doc. 13) at p. 3:2-3* ("Stangel

13  and Lindsay planned to meet in Bisbee to finalize and execute their [Texas Contract]."); *see*

14  *also Id. at p. 2:23-25* ("***Stangel and Lindsay communicated off and on for about six***

15  ***months*** [in Texas, prior to the Bisbee Trip], after which Lindsay pitched the idea to Stangel

16  that he would hire her to assist him with travel plans in return for the Property." (emphasis

17  added)); *see also Exhibit A to Opposition (Doc. 13-1) at p. 3, ¶¶ 10-11* (First meeting Mr.

18  Lindsay in Texas in October 2023 & discussing the purchase of the Property); *¶¶ 12-14*

19  (Texas negotiations in March 2024 and offer to purchase travel coordinator services prior

20  to the Bisbee Trip); and *¶ 15* (Escrow opened from Texas before the Bisbee Trip).

21   Ms. Stangel ***admits*** that the parties negotiated and signed the Lease for the Property

22  while in Texas, after the parties returned home from the Bisbee trip. *Opposition (Doc. 13)*

23  *at p. 3:17-20*; *see also Exhibit A to Opposition (Doc. 13-1) at ¶ 24* ("Days later, after

---

24  [1] Mr. Lindsay objects to Ms. Stangel's wrongful addition of facts from the unpermitted,
25  pending 2AC and, therefore, addresses the facts alleged in the 1AC and those from the
    Opposition consistent with it. Mr. Lindsay warned that Ms. Stangel was using the 2AC to
26  wrongfully supplement the facts of her Opposition and – as predicted – she has done so.
    *Opposition (Doc. 13), at "Facts" Section.* But, as argued in the 2AC Opposition, the 2AC
    is prohibited as untimely assertions of facts she should have known or as estopped, etc.

Lindsay and we had left Bisbee, Lindsay called me and asked me to draft a lease agreement for the Property.").

So, when the *Morrill* test asks whether Mr. Lindsay undertook some bad acts in availing himself of the laws of the state of Arizona or whether he directed tortious acts there, the negotiation of the Texas Contract and any consideration of the Lease are decidedly Texan and cannot be used to substantiate Arizona jurisdiction; this is especially so because the "challenged conduct" does not arise from those alleged Texas acts as required by *Morrill*. *Morrill v. Scott Financial Corp.*, 873 F.3d 1136, 1145 (9th Cir. 2017).

C. *Ms. Stangel Did Not Even Allegedly "Reside" in Arizona Until June 4, 2024, which Proves that Almost All of the Events Took Place in Texas or Outside of Arizona, and Ms. Stangel Admits as Much*.

Ms. Stangel ***admits*** that she was a resident of Texas until June 4, 2024, almost two (2) months from the execution of the Texas Contract. *Exhibit A to Opposition (Doc. 13-1), at p. 3, ¶ 2* ("I [Ms. Stangel,] have lived in Bisbee since approximately June 2024[.]"); *Id. at p. 7, ¶ 25* ("But when the [May-June] trip ended, I flew back to Tucson and joined Beau at the Property."); *Id. at p. 9, ¶ 32*; *see also Exhibit E to MtD (Doc. 8-1) pp. 30-34* (p. 33 shows Ms. Stangel flew back to Tucson on June 4, 2024, after which time she purports to have begun residing at the Property).

Of the documented forty-one (41) days Ms. Stangel's timecards report she allegedly provided travel coordinator services, at most, only six (June 12-15, 28-29, 2024) could have happened at the Property because she did not move into the Property until June 4, 2024, and the rest were in "active travel" outside of Arizona. *Id.* This conclusively proves that the vast majority of any services she alleges to have performed under the Texas Contract occurred outside of Arizona. *Id.*; *see also 1AC ¶¶ 43-115* (all of the alleged "challenged conduct" happened out of country). Therefore, even Ms. Stangel's "residence" for the duration of negotiation, and two months thereafter, is decidedly Texan—as is her performance of the vast majority of alleged services outside of Arizona and directed to Mr. Lindsay in Texas.

1  These facts cut in favor of dismissal under the Fifth "unreasonableness" element

2  under *Brand v. Menlove Dodge*, 796 F. 2d 1070, 1075 (9ᵗʰ Cir. 1986). These facts also

3  support Mr. Lindsay's argument that Arizona is the improper venue under FRCP 12(b)(3);

4  28 U.S.C.A. §§ 1391 & 1406(a). Ms. Stangel was simply not an Arizona resident for the

5  full duration of Texas Contract negotiation and the vast majority of her purported services

6  to Mr. Lindsay occurred while in Texas or out of country.

7  **III.  THE 1AC FAILS *MORRILL* BECAUSE NO ALLEGED TORTIOUS CONDUCT OR**

8  **ALLEGED CONDUCT VIOLATIVE OF THE TEXAS CONTRACT OCCURRED IN, OR WAS DIRECTED AT, ARIZONA, AND MS. STANGEL POINTS TO NONE.**

9  Look at the action words (the verbs) that Ms. Stangel uses to describe Mr. Lindsay's

10  alleged conduct in Arizona and the Court will quickly see that none of these actions are

11  tortious or violative of the Texas Contract, ***in themselves***, as required to sustain jurisdiction

12  in Arizona. *See Opposition (Doc. 13), at p. 2:1-9* (Mr. Lindsay: "purchased" the Property

13  and "moved" Ms. Stangel); *See also Id. at p. 9:3-11* (Mr. Lindsay's allegedly Arizona aimed

14  conduct was to "Purchase," "meet," "negotiate," and "agree"); *see also Id. at p. 11:1-6*

15  (Mr. Lindsay allegedly "acquired," "persuaded," "enabled," and "entered" the Texas

16  Contract). But these actions are not *all* alleged in the 1AC, which limits Mr. Lindsay's

17  Arizona-related conduct to allegations that Mr. Lindsay: "Met" (*1AC, ¶ 24*), "purchased"

18  (*1AC, ¶ 25*), and "executed" (*1AC, ¶ 26*). None of these actions, as alleged, are in any way

19  tortious or violative of the Texas Contract much less Arizona conduct giving rise to the

20  claims supporting the exercise of Arizona jurisdiction. *Id.*

21  In fact, Ms. Stangel outright ***admits*** that the alleged tortious conduct happened

22  outside of Arizona. *See 1AC (Doc. 6), at ¶¶ 43-115*; *see Opposition (Doc. 13), at p. 6:24-*

23  *26* ("Lindsay committed the torts on work trips[.]"). None of the alleged tortious actions

24  involve Arizona. *Id. at p. 9:6-11* (No allegations that the "breach," "trafficking," or "IIED"

25  occurred anywhere but out of country—not in Arizona). Ms. Stangel admits that it is the

26  alleged torts that provide the basis for all of the claims in the 1AC. *Id. at p. 6:21-26*

1  (admitting that the alleged torts, committed outside of Arizona, are the basis of both the

2  contract and tort claims).

3      Neither can Mr. Lindsay—in any way—be considered to have created sustained

4  contacts with Arizona when the terms of the Texas Contract and the Lease overtly absolve

5  him of any routine obligations toward the Property. *See Texas Contract, Exhibit A to 1AC*

6  *(Doc. 1-2)* (making Ms. Stangel responsible for ensuring taxes and insurance are covered,

7  without granting a possessory right); *see also the Lease at Exhibit A-2 (Doc. 13-1), at pp.*

8  *15-18* (making Mr. Reichert fully responsible for light maintenance, taxes, and insurance at

9  the Property). The provisions of the Lease and Texas Contract clearly show that Mr.

10  Lindsay had negotiated ***out of*** sustained contacts with Arizona. *Id.*

11      *Morrill* requires that the alleged "challenged conduct" (i.e., alleged torts and Texas

12  Contract violations) must have happened in Arizona or have been aimed at Arizona, which

13  the 1AC expressly rules out. *1AC (Doc. 6), at ¶¶ 43-115*. And "mere injury to a forum

14  resident is not a sufficient connection to the forum." *Picot v. Weston*, 780 F.3d 1206, 1214

15  (9th Cir. 2015)(internal quotations omitted). Furthermore, *Morrill* "looks to the defendant's

16  contacts with the forum state itself, not the defendant's contacts with the persons who reside

17  there." *Morrill*, 873 F.3d 1136, 1143. Under these standards, no set of facts before the Court

18  sufficiently meet the *Morrill* test requiring the alleged bad conduct to have happened within

19  or to have been directed at Arizona (not based on contacts with Ms. Stangel there).

20  **IV.    THE RELEVANT EVENTS ARE ALLEGED TO HAVE OCCURRED OUTSIDE OF
   ARIZONA, MS. STANGEL CURRENTLY WORKS IN TEXAS/WILL CONTINUE TO DO
21  SO, AND "HOME" WAS IN TEXAS AT EXECUTION.**

22      The 1AC and the Opposition ***admit*** that there is a flood of evidence that the Texas

23  Contract was negotiated in Texas, that Ms. Stangel wants to work in Texas, and currently

24  ***does*** work in Texas for the Sekrit theater there. *See Supra, at § II(a)-(c)*; *see also Exhibit A*

25  *to Opposition (Doc. 13-1), at p. 7, ¶ 33* ("My role in the business of the [Texas-based] Sekrit

26  theater is limited. I occasionally assist with marketing strategy.").

1      Mr. Lindsay had no connection to Arizona save that the parties met on April 12,

2    2024, to sign the Texas Contract. *Id*. The Texas-based Sekrit Theater is overtly listed in the

3    Texas Contract as Ms. Stangel's state of residence. *Id*. The 1AC affirms the parties' Texas

4    negotiations and Ms. Stangel's desire to continue working in Texas (¶¶ 6-26, 126). *Id*. The

5    1AC alleges that the Parties negotiated the Texas Contract in Texas and Ms. Stangel

6    directed her services to Mr. Lindsay in Texas or on world travels (¶¶ 19-23, 33, 41, 43-115).

7    *Id*.; *see also Exhibit E to MtD (Doc. 8-1), at pp. 30-34* (though not Mr. Lindsay's contacts,

8    still, only a maximum of six (6) days of listed services could possibly have occurred in

9    Arizona after Ms. Stangel's June 4, 2025, alleged move-in date); *see also Exhibit A to*

10   *Opposition (Doc. 13-1), at pp. 4-5, ¶¶ 10-15* (admitting the negotiation of the Texas

11   Contract occurred sufficiently enough for Mr. Lindsay to make an offer, ***prior to*** the Bisbee

12   Trip); *see Id. at p. 7, ¶ 24* (Ms. Stangel drafted the Lease upon returning from the Bisbee

13   Trip); *see Id. at p. 9, ¶ 33* (Ms. Stangel currently works for the Texas-based Sekrit Theater).

14       If the explicit terms of the Texas Contract are to be honored, then "home" for both

15   signatories was in Texas because both listed Texas addresses for purposes of the Texas

16   Contract. *See Exhibit A to 1AC (Doc. 1-2)*. Indeed, mail directed to the tenant at the Property

17   is now returning as undeliverable because there is no one there to receive it apparently. *See*

18   *Mail Returned from the Property as Undeliverable attached as **EXHIBIT A*** (indicating that

19   Ms. Stangel does not reside at the Bisbee Property, at all, as the USPS returned as

20   undeliverable the November 20, 2025, letter sent Certified Mail to that address).

21       Aside from Ms. Stangel's questionable continued claim to reside in Arizona, there

22   are no facts alleged that implicate Mr. Lindsay's connection to Arizona under *Morrill*, under

23   federal Venue statutes (*28 U.S.C.A. §§ 1391 & 1406(a)*), and under any rendition of the

24   Choice of Law authority governing this case (*Rstmt (2nd) of Conflict of Laws § 188(3)*.). A

25   single day meeting on the Bisbee Trip will not imbue this Court with sufficient contacts in

26   light of the facts as alleged by the 1AC.

**V. THE LEASE AND THE TEXAS CONTRACT ARE COMPLETELY SEPARATE DOCUMENTS AS ARGUED BY MS. STANGEL, HERSELF, TO THE COCHISE COUNTY SUPERIOR COURT IN THE EVICTION ACTION (THE "EA").**

Mr. Lindsay re-asserts (as if set forth in full herein) that Ms. Stangel is estopped to argue that the two documents are basically one transaction or that the EA activity provides any basis for relief in this matter. *See Mr. Lindsay's Opposition ("2AC Opposition") to Motion for Leave to File Second Amended Complaint (the "2AC")(Doc. 14), at pp. 9:16 to 11:19*; *see also Id. at p. 4:7 to 5:13* (establishing that the two documents set up two totally separate sets of rights/obligations that could have pit Mr. Reichert's interests against Ms. Stangel's). This is further absolutely established in that the Texas Contract does not give Ms. Stangel any possessory interest in the Property. *See Exhibit A to 1AC (Doc. 1-2)*. Ms. Stangel is not a tenant named in the only Lease that grants any possessory interest—and that, to Mr. Reichert alone. *Exhibit A-2, to Opposition (Doc. 13-1), at pp. 15-18*. Thus, the record conclusively establishes that there is no "overlap" between the Texas Contract and the Lease and any action as against the tenancy of Mr. Reichert is wholly separate and apart from any unrealized interest Ms. Stangel might have once claimed under the Texas Contract. The law simply will not allow an action to be considered "adverse" against rights that Ms. Stangel ***does not possess and of which she is in no way a part***.

Neither can Ms. Stangel use any part of the EA to establish some kind of retaliatory conduct aimed at herself—or other relief in this matter—because she has admitted that she has no possessory interest via the Texas Contract or the Lease; all actions regarding landlord/tenant rights and duties are strictly between parties who are ***not*** Ms. Stangel. *See 2AC Opposition (Doc. 14), at pp. 5:14 to 6:22, pp. 10:10 to 11:10, and pp. 14:4 to 15:11*; *Id. at pp. 9:16 to 11:19* (demonstrating that—far from creating joint rights in Mr. Reichert and Ms. Stangel—Mr. Reichert would have had rights/obligations as ***against*** Ms. Stangel (and vice-versa) had Ms. Stangel succeeded to ownership prior to the three-year Lease term ending). Ms. Stangel has legally severed the two documents, and at any rate the law will

not allow the Lease or rights/obligations of parties who are **not** Ms. Stangel to be used as a cudgel in this matter. She simply cannot insert herself in a legal relationship ***not*** her own.

## VI.    THE COURT MAY GRANT MR. LINDSAY LEAVE TO SUPPLEMENT THE "REASONABLENESS" ANALYSIS.

"The plaintiff bears the burden of satisfying the first two prongs of the test. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. If the plaintiff succeeds in satisfying both of the first two prongs, the burden shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *See Morrill v. Scott Financial Corp.*, 873 F.3d at 1142 (*quoting Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d at 802). U.S. District Courts have broad discretion to allow supplemental briefing, specifically as to the third prong of "reasonableness." *See Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 917-918 (9th Cir. 2011) (overruled on other grounds but affirming the trial court's grant of supplemental briefing on the "reasonableness" prong of the *Morrill* test).

Mr. Lindsay did include a treatment of the seven (7) factors for weighing "reasonableness." *See MtD (Doc. 8), at p. 13:6 to 15:2*. However, given the page-limits—and that the obligation to substantiate "unreasonableness" does not arise until after the Court makes a finding on the first two prongs—Mr. Lindsay cannot bear the burden to make a fulsome showing on that third prong until after the duty arises by finding of the Court. *Id*. Mr. Lindsay is merely asking the Court to exercise its discretion to allow a short supplement on that issue alone, ***if***, the Court finds Ms. Stangel has satisfied its first two prongs of *Morrill*. This is permitted by the rules. *Supra*.

## VII.    THE RESTATEMENT INSTRUCTS THIS COURT TO GIVE VERY LITTLE WEIGHT TO THE LOCATION OF THE TEXAS CONTRACT'S EXECUTION.

Ms. Stangel contends that the location of the execution of the Texas Contract is the primary determinant for personal jurisdiction. *Opposition (Doc. 13), at p. 7:15-16, p. 10:15-16, p. 13.:21-23, p. 15:9-10 & 15:21-23*. But the applicable law to this case states that the one-day signing in Bisbee is virtually a non-entity to establishing jurisdiction or choice of

1  law. *Rstmt (2nd) of Conflict of Laws § 188(3) at ¶ e* ("Standing alone, the place of

2  contracting is a relatively insignificant contact.").

3       If the Court makes a T-Chart of all of the relevant Texas-related contacts on one side

4  and the relevant Arizona contacts on the other: the outcome is very clear. On the Texas side

5  would be: (1) both parties lived and worked in Texas prior to the April 12th signing; (2) Ms.

6  Stangel still does work—and desires to continue working—in Texas at the Sekrit Theater

7  listed as her Texas residence; (3) the Parties negotiated the Texas Contract almost wholly

8  in Texas (per the 1AC and Plaintiff's declarations touting ***months of negotiation*** ending in

9  Mr. Lindsay's April 3, 2024 offer—***prior to the Bisbee Trip***), with only execution

10 happening in Bisbee; (4) The Texas Contract was completely directed at Mr. Lindsay in

11 Texas for services to be provided around the world travelling (anywhere but Arizona); (5)

12 both Parties signed the Texas Contract in their capacities as Texas residents; (6) Plaintiff

13 directed all of her communications to Mr. Lindsay in Texas; (7) All expenses were paid

14 from Texas; (8) there are zero real estate claims in the 1AC; and (9) all of the potential

15 witnesses are in Texas or otherwise outside of Arizona. *MtD (Doc. 8), at p. 9:20 to 11:1*.

16      On the "Arizona" side of the T-Chart (according to the 1AC) there would only exist

17 one day in Bisbee when the Parties met to sign the Texas Contract they had, admittedly,

18 ***spent months prior negotiating and talking through***. *1AC (Doc. 6), at p. 3, ¶¶ 24-26*. Per

19 the 1AC, none of the alleged (and completely fabricated) sexual misconduct, firing, threats,

20 or refusal to convey the Property occurred—in any way—within, or directed toward,

21 Arizona. *Id. at ¶¶ 43-115*. Therefore, the relevant Choice of Law rules dictate that Texas

22 law is the one most properly applied to this matter—not Arizona law.

23      **WHEREFORE**, Mr. Lindsay respectfully requests this Court take the 1AC on its

24 face as alleging no facts that satisfy *Morrill*, that allow Arizona venue, or that allow the

25 application of Arizona law, and dismiss this matter, while awarding Mr. Lindsay attorney's

26 fees/costs as permitted by law.

1    RESPECTFULLY SUBMITTED this 15th day of January 2026.

2                                         BURRIS & MACOMBER, PLLC

3
                                          */s/ Jeremy T. Shorbe*
4                                         D. Rob Burris, Esq.
                                          Jeremy T. Shorbe, Esq.
5                                         *Attorneys for Defendant*

6

7    ORIGINAL e-filed this
8    15th day of January 2026 to:

9    Clerk of the United States District Court
10   405 West Congress Street, Suite 1500
     Tucson, AZ 85701
11
     Copy of the foregoing to be e-served
12   this 15th day of January 2026 to:

13
     Silence Law Group, PLLC
14   20235 N. Cave Creek Rd., Ste. 104 # 460
     Phoenix, AZ 85204
15   Jeffrey Silence, Esq.
16   jeff@silencelaw.com
     Trevor Cook, Esq.
17   trevor@silencelaw.com

18
     Shields Petitti & Zoldan, PLC
19   James Burr Shields
20   burr@shieldspetitti.com
     *Attorneys for Plaintiff*
21
     By: */s/Jo Lynn Goldener*
22

23

24

25

26