**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cameron Stangel,<br>Plaintiff,<br>v.<br>Jeffery Lindsay,<br>Defendant. | No. CV-25-00471-TUC-JCH<br>**ORDER** |

Before the Court is Defendant Jeffrey Lindsay's Motion to Dismiss (the "Motion") (Doc. 8). The matter is fully briefed (Docs. 13, 16, 26, 27), and the Court held oral argument on February 26, 2026 (Doc. 18.) For the following reasons, the Court will deny the Motion.

## I. Factual Background[1]

In 2022, Stangel and her partner, Beau Reichert, found a property they were interested in purchasing in Bisbee, Arizona (the "Property"). (SAC at 2.) In 2023, Stangel met Lindsay in Texas and informed Lindsay of her hope to purchase the Property. (*Id.* at 2–3.)

In April 2024, Lindsay offered Stangel a position as his "Personal Travel Coordinator" in return for the Property. (*Id.* at 3.) That month, Stangel and Lindsay met in Bisbee where Lindsay purchased the Property. (*Id.*) They also executed a "Personal Travel

[1] The background summarizes the facts of the Second Amended Complaint (Doc. 19 ("SAC")) which, for purposes of this Motion, the Court accepts as true, drawing "all reasonable inferences" in Stangel's favor. *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009).

Coordinator Service Agreement" (the "Agreement"). (*Id.*) Under the Agreement, Stangel would provide "travel coordination services" for Lindsay, such as planning and organizing itineraries, preparing documents, applying for visas, and booking transportation and accommodations. (*Id.*) The Agreement provided that Stangel would not receive regular compensation for her employment. (*Id.* at 4.) Instead, in exchange for 520 days of "active travel coordination," or after three years of employment, whichever came first, Lindsay would compensate Stangel with ownership of the Property. (*Id.*) The Agreement also required Stangel to pay for the Property's taxes and insurance. (*Id.*) The Agreement commenced April 12, 2024, and would automatically terminate April 10, 2027. (*Id.*)

On May 15, 2024, Lindsay's purchase of the Property closed. (*Id.*) The following month, Lindsay entered into a residential lease agreement (the "Lease") with Reichert so that Stangel and Reichert could live at the Property while Lindsay performed her travel coordinator services. (*Id.* at 4–5.) Reichert would not pay rent under the Lease, but was responsible for the utilities, home insurance, and property taxes. (*Id.*) The Lease term was from April 12, 2024, to April 9, 2027. (*Id.* at 4.) Stangel and Reichert moved into the Property in May 2024 and continue to live there today. (*Id.* at 5.)

In late August 2024, Stangel accompanied Lindsay on a month-long international trip (the "Trip"). (*Id.* at 6–11.) On the Trip, Lindsay made sexual comments to and about Stangel and "became increasingly hostile as Stangel rebuffed his unwelcome sexual advances." (*Id.* at 6–7.) After tensions grew, Lindsay terminated Stangel's employment on September 12, 2024, and did not transfer the Property to Stangel. (*Id.* at 10–12.) In October 2024, Lindsay paid the Property's taxes and in November, Lindsay substituted his own payment for the Property's insurance. (*Id.* at 12.)

In December, Stangel retained counsel, who sent Lindsay a demand letter raising potential claims against him. (*Id.*) In April 2025, Lindsay's former counsel sent Reichert a letter accusing him of breaching the Lease, followed by a second letter three weeks later purporting to terminate the Lease and instructing Stangel and Reichert to vacate the Property. (*Id.*) On June 9, 2025, Lindsay filed an eviction action ("EA") against Reichert, which the Justice Court dismissed with prejudice. (*Id.* at 13.) On December 17, 2025,

Lindsay's former counsel inspected the Property. (*Id.* at 13–16.)

**II. Procedural History**

On August 19, 2025, Stangel filed her Complaint (Doc. 1), followed by her First Amended Complaint on September 29, 2025 (Doc. 6). On November 17, 2025, Lindsay filed the instant Motion (Doc. 8), seeking dismissal of the FAC under Federal Rules of Civil Procedure ("Rules") 12(b)(2), (3), and (6).

In a February 26, 2026 hearing the Court granted Stangel's Motion to Amend. (Doc. 18.) The Court also gave the parties leave to file 10-page supplemental briefing for Lindsay's pending Motion to address the newly added facts and claims in Stangel's SAC. (*Id.*) That same day, Stangel filed the now-operative SAC.

On April 3, 2026, Lindsay filed his supplemental briefing (Doc. 26), adding additional arguments under Rule 12(b)(6), followed by Stangel's supplemental briefing on April 10, 2026 (Doc. 27).

**III. Motion to Dismiss**

Lindsay requests this Court dismiss the SAC under Rules 12(b)(2), (3), and (6). (*See generally* Docs. 8, 26). Lindsay argues he lacks continuous and systematic contacts with Arizona for general personal jurisdiction (Doc. 8 at 5–6), and that Lindsay has neither purposefully availed himself of Arizona's laws nor purposefully directed his actions toward Arizona, (*Id.* at 8–13). Lindsay also argues that Arizona is an improper venue under 28 U.S.C. § 1391 because Lindsay resides in Texas and the most substantial part of the events giving rise to the claims occurred in Texas. (*Id.* at 15–16.) Then, Lindsay argues that under Arizona's choice of law test, Texas law applies to this case because the negotiations of, performance under, and subject matter of the Agreement all occurred in Texas. (*Id.* at 16–17.) Finally, Lindsay argues the SAC's Counts 1, 3, 5, 6, 7, 8, and 9 fail to state claims for relief. (Doc. 26 at 6–11.)

**A. Personal Jurisdiction Under Rule 12(b)(2)**

**i. Standard of Review**

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate."

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). The plaintiff must establish personal jurisdiction over a defendant with respect to each claim. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1289 n.8 (9th Cir. 1977).

Where, as here, a district court rules on a motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts" to withstand the motion to dismiss. *See Schwarzenegger*, 374 F.3d at 800 (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir.1990)). The Court accepts all uncontroverted allegations in the SAC as true, *see id.*, and resolves all disputed facts in Stangel's favor, *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015).

**ii. Applicable Law**

Because there is no applicable federal statute governing personal jurisdiction here, the Court applies the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A); *Schwarzenegger*, 374 F.3d at 800. Arizona's long-arm statute is coextensive with federal due process requirements. *See* Ariz. R. Civ. P. 4.2(a); *A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995). Under the Due Process Clause, a federal district court may exercise jurisdiction over a person who is not physically present within the territorial jurisdiction of the court so long as the nonresident has sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023) (quoting *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022)); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Depending on the strength of a nonresident's contacts, personal jurisdiction may be either general or specific. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). Stangel argues only for specific jurisdiction (*see generally* Docs. 13, 27), which exists when a lawsuit arises out of, or is related to, the defendant's contacts with the forum. *Helicopteros Nacionales de Colo., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

The Ninth Circuit uses a three-part test to analyze whether a party's "minimum

contacts" satisfy due process for the exercise of specific jurisdiction. *Impossible Foods*, 80 F.4th at 1086. Under this three-part test, specific jurisdiction exists only if: (1) the defendant purposefully availed himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws, or purposely directed conduct at the forum that had effects in the forum; (2) the claim arises out of the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable. *Id.* The plaintiff must meet the first two prongs. *Id.* at 1087. Then, the burden shifts to the defendant to show a "'compelling case' that exercise of jurisdiction would not be reasonable." *Id.* Finally, while the purposeful availment test is often better for analyzing contract claims and the purposeful direction test for tort claims, there is no "hard-and-fast rule" for applying the tests or a "rigid dividing line" between the two types of claims. *Davis v. Cranefield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (2023).

Stangel raises claims sounding in both contract and tort. (*See generally* SAC). However, the Court finds the purposeful availment test most cleanly applies to the facts of this case and will assess Lindsay's conduct under that test.[2]

**a. Purposeful Availment**

The purposeful availment test requires "[a] showing that a defendant purposefully availed himself of the privilege of doing business in a forum state" which "typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. "[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *See Picot*, 780 F.3d at 1212 (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008)). Instead, "[a] defendant must have 'performed some type of affirmative conduct which

[2] Lindsay argues Stangel's claims sound primarily in tort and thus the purposeful availment test cannot apply here. (Doc. 8 at 9.) There is no rigid dividing line between the tests, with both inquiring "into the defendant's 'purposefulness' vis-à-vis the forum state, ensuring that defendants are not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.'" *Impossible Foods*, 80 F.4th at 1089 (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020)). Thus, the Court disagrees with Lindsay and applies the purposeful availment test here.

allows or promotes the transaction of business within the forum state.'" *Id.* (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)). "In determining whether such contacts exist, we consider 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)).

The Court finds that Lindsay undertook affirmative conduct allowing for the transaction of business in Arizona. The SAC alleges the parties partly negotiated and fully executed the Agreement while in Arizona. (SAC at 3, Doc. 13-1 at 6) Although Lindsay disputes this fact and labels the Agreement a "Texas Contract," Lindsay only points to evidence showing the Agreement was *partly* negotiated in Texas, which aligns with Stangel's assertions. (*See generally* Docs. 8; 16, 26.) And the Court accepts the factual allegations in the SAC, which are supported by Stangel's personal declaration (Doc. 13-1 at 6), as true for purposes of this Motion. *See In re W. States Wholesale Nat. Gas*, 715 F.3d at 741. Further, it is undisputed that the parties spent at least a day negotiating in Arizona and ultimately signed the Agreement in Arizona.

Stangel also argues Lindsay knew she would be residing in Arizona while performing her duties under the Agreement. (Doc. 13 at 4, 7) Lindsay asserts Stangel listed a Texas address on the Agreement, and that only Mr. Reichert's name was on the Lease, which an Arizona state court has adjudicated as wholly separate from the Agreement.[3] (Doc. 16 at 9–10.) Lindsay also asserts that Stangel at most worked from the Property for six days because she did not move into the Property until June 4, 2024, and the remaining working days were "active" travel days with Lindsay. (Doc. 16 at 8.)

The SAC asserts Stangel and Reichert moved into the Property in "May 2024, after the repairs were completed and escrow closed." (SAC at 5.) In June 2024, Stangel "returned from her first trip with Lindsay as his Travel Coordinator to the Tucson airport and went home from there to the Property," which Lindsay knew. (*Id.*) Although only Mr.

---

[3] Lindsay is correct that the Lease did not confer possessory interest in the Property to Stangel, and Stangel does not assert otherwise. Instead, Stangel seeks to litigate her interest in the Property under the Agreement, which she alleges Lindsay breached.

Reichert signed the Lease, the Lease contains nearly identical dates to the Agreement, and the Agreement required Stangel to pay the insurance premiums and taxes for the Property. (Compare Doc. 8-1 at 21–22 (Agreement) with Doc. 13-1 at 33–34 (Lease)) The Court finds the parties intended these two contracts to operate in concert with one another and, thus, intended for Stangel to execute her duties under the Agreement from the Property in Bibsee. *See Secure Resols., Inc. v. Thompson*, No. CV-08-1156-PHX-NVW, 2008 WL 4415309, at *1 (D. Ariz. Sept. 26, 2008) (finding defendants took "deliberate action within the forum state" and "created continuing obligations to forum residents" sufficient for personal jurisdiction by contracting to work for Arizona company (quoting *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004))).

Further, the SAC alleges Lindsay retaliated against her by wrongfully inspecting the Property and baselessly appealing the EA in Arizona state court. (SAC at 12–16, 22–23.) These additional acts show Lindsay submitted himself to the jurisdiction of the Arizona state court and that Lindsay has purposefully availed himself of the privilege of doing business (i.e., owning a property at the center of the instant action and litigating about that property) in Arizona.

Moreover, and most persuasive to the Court, Stangel argues Lindsay reached into the State by purchasing the Arizona property and using it as the only compensation contemplated in the Agreement. (Doc. 13 at 8–9.) Lindsay does not dispute that he purchased the Property, nor that Stangel was to be paid with the Property's title upon completing her duties under the Agreement. Stangel in part claims that Lindsay materially breached the Agreement and thus, under the Agreement, she is entitled to the Property's title. (SAC at 16–17.) These facts, accepted as true, show Lindsay taking deliberate action in Arizona. [4]

---

[4] In the Court's view, these facts resemble those necessary to exercise *quasi in rem* jurisdiction over an action. Although federal courts no longer apply the traditional form of *quasi in rem* jurisdiction, *see Shaffer v. Heitner*, 433 U.S. 186 (1977), the Supreme Court has nonetheless upheld *quasi in rem* jurisdiction as a form of personal jurisdiction where a defendant's property ownership in the forum state is substantially related to the litigation and otherwise satisfy the *International Shoe* requirements. *See Burnham v. Superior Ct. of California*, 495 U.S. 604, 621 (1990). One type of *quasi in rem* jurisdiction arises where a "plaintiff asserts an interest in property and seeks to have his interest established as against

In sum, the parties partly drafted, negotiated, and executed the Agreement in Arizona and the Agreement contemplated Stangel carrying out her duties in Arizona in exchange for payment in the form of real property located in Arizona. Thus, Lindsay purposefully availed himself of the privilege of conducting activities within Arizona. The Court finds Stangel has established prima facie evidence for this prong.

**b. Arising out of**

"In conducting this second prong of the inquiry, 'we consider the extent of the defendant's contacts with the forum and the degree to which the plaintiff's suit is related to those contacts.'" *Impossible Foods*, 80 F.4th at 1091 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006)). "A single contact with the forum state may be sufficient to support jurisdiction if the action 'arise[s] out of that particular purposeful contact of the defendant with the forum state.'" *Id.* (quoting *Yahoo! Inc.*, 433 F.3d at 1210).

Lindsay argues "absolutely zero of the alleged bad conduct was 'aimed at' Arizona in any way," with the alleged bad acts concerning negotiation of a "Texas Contract" in Texas by Texas residents for travel "anywhere but Arizona" on funds paid for by a Texas resident, and sexual harassment allegedly occurring internationally. (Doc. 8 at 12.)

Stangel's claims arise out of Lindsay's specific purposeful contact with Arizona—his purchasing the Property and executing the Agreement for Stangel's services in Arizona. Stangel sues for breach of the Agreement partly negotiated, drafted, and executed in Arizona, title to the Property in Arizona, unpaid wages and sick time under Arizona statutes accrued while Stangel worked in Arizona, and wrongful termination under an Arizona statute. (*See generally* SAC.) She also alleges unlawful retaliation under an Arizona statute, arguing that Lindsay wrongfully inspected the Arizona property and baselessly appeals the EA in Arizona state court. (*Id.* at 22–23.) Her federal sex trafficking and State IIED claims also arise from the Agreement. Stangel claims Lindsay "intended to coerce her into having sex with him in return for title to the Property" and executed the

---

the claim of a designated person or designated persons." Restatement (First) of Judgments § 32 (1942). These facts, at minimum, closely resemble quasi in rem jurisdiction.

Agreement so that Stangel would "accompany him on travel to isolated or foreign locations where she was financially dependent on him" and implied that Stangel's "satisfactory performance of the . . . Agreement depended on her positive response to his sexual advances." (SAC at 20.) For these reasons, the Court finds that Stangel has presented prima facie evidence that her suit arises out of Lindsay's contacts with Arizona.

**c. Reasonableness**

"We examine seven factors to determine whether exercise of jurisdiction is reasonable: (1) existence of an alternative forum; (2) burden on the defendant; (3) convenience and effectiveness of relief for the plaintiff; (4) most efficient judicial resolution of the dispute; (5) conflict with sovereignty of the defendant's state; (6) extent of purposeful interjection; and (7) the forum state's interest in the suit." *Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986) (internal citations omitted). The burden is on Lindsay to show that exercising jurisdiction over this matter would not comport with fair play and substantial justice. *See Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1487 (9th Cir. 1993)

Lindsay first argues that Texas is an available alternative forum, which would not burden Stangel because she has a residence "just minutes away from the Western District of Texas District Court" and has expressed a want to continue working in Texas and willingness to go there. (Doc. 13 at 12–13.) The "residence" Lindsay references is the "Sekrit Theater." (*Id.*) Lindsay's screenshots of the property's website describe the property as an "abandoned garden photography space," providing no support for Lindsay's assertion this is a "residence." (Doc. 8-1 at 5–11.) Lindsay's other assertions fare no better, standing in great contrast with Stangel's declaration that she has resided at the Property in Bisbee since she executed the Agreement and wants to work primarily in Arizona, only renting booth space in Texas twice yearly.

Lindsay next argues that a Texas forum would provide the most efficient judicial resolution of the dispute because "Texas law most appropriately applies here" and all of the potential witnesses are non-Arizona residents. The Court agrees that many of the witnesses either party may call would be from Texas or otherwise reside outside of

Arizona. However, the Court discounts this consideration given "modern advances" in communication and transportation. *See Caruth v. Internat'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995). Further, as explained more fully below, the Court finds that Texas law does not apply here.

Lindsay then argues "Texas has the biggest dog in the fight of state interests as this Texas Contract was negotiated there by Texas residents." (Doc. 8 at 14.) For the same reasons the Court found Lindsay purposefully availed himself of the privilege of doing business in Arizona, the Court finds Arizona has a vested interest in this suit. The parties executed the Agreement for services Stangel would render from Arizona in exchange for the Property located in Arizona.

Considering Lindsay's above arguments, the Court finds he has not carried his burden of showing that the Court's exercise of jurisdiction would be unreasonable. Accordingly, the Court has personal jurisdiction over Lindsay and will deny Lindsay's Motion on this claim.

**B. Venue under Rule 12(b)(3)**

28 U.S.C. § 1391(b) permits a civil action be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

As a preliminary matter, although Lindsay couches his argument as an argument for improper venue under Rule 12(b)(3), his argument most closely resembles a forum non conveniens argument. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.2002) ("A party moving to dismiss based on forum non conveniens bears the burden of showing (1) that there is an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal."). Lindsay argues he resides in Texas, the most substantial part of the events occurred in Texas, and the bulk of relevant

witnesses are in Texas. (Doc. 8 at 15–16.) Even accepting Lindsay's arguments as true, they do not show that venue in Arizona is improper, but rather that venue in Texas may *also* be proper.

For the same reasons the Court found it properly exercises personal jurisdiction over this matter, the Court finds that venue is proper in this judicial district under § 1391(b)(2). A substantial part of the events and omissions giving rise to the claims occurred in Arizona, and the real property at the center of the dispute is in this District.

**C. Choice of law under Rule 12(b)(6)**

In diversity cases, "the district court must apply the choice-of-law rules of the state in which it sits." *Labertaw v. Chartis Property Casualty Co.*, 363 F.Supp.3d 1031, 1036 (9th Cir. 2019). "Arizona follows the Restatement's 'most significant relationship' test." *Id.* The Restatement (Second) of Conflict of Laws § 188 describes this test as follows:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place of contracting,
> >
> > (b) the place of negotiation of the contract,
> >
> > (c) the place of performance,
> >
> > (d) the location of the subject matter of the contract, and
> >
> > (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

For the same reasons as above, the Court finds that under the "most significant relationship" test, Arizona law applies to this action. The Agreement was partly negotiated in Arizona and Texas but was wholly executed in Arizona. Stangel asserts she carried out her online travel coordination duties under the Agreement from Arizona, and that the only duty Lindsay had under the Agreement was to transfer title of the Arizona Property to Stangel upon conclusion of the Agreement. Lindsay is a resident of Texas, but Stangel maintains she is a resident of Arizona. On balance, the factors favor Arizona law.

**D. Failure to state a claim under 12(b)(6)**

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Thus, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Lindsay argues the SAC fails to state a claim for relief on Count 1 for breach of implied duty of good faith and fair dealing; Count 3 for failure to pay Arizona sick time; Count 5 for federal sex trafficking; Count 6 for IIED; and Counts 8–9 for retaliatory property inspection. The Court addresses each argument in turn.

**1. Sick time and retaliation**

The SAC raises claims for failure to pay Arizona minimum wage under A.R.S. § 23-364, failure to pay Arizona sick time under A.R.S. § 23-373, and related retaliation claims pertaining to the Property inspection under § 23-364(B) and § 23-373(B). Lindsay argues Stangel's allegations on failing to pay sick time are conclusory, the Property inspection was lawful as a matter of law, and that Stangel's retaliation allegations are conclusory.

. . . .

**i. Applicable law**

Arizona law required Lindsay to pay Stangel "no less than the minimum wage" of $12 an hour, with upward adjustments for cost of living. *See* § 23-363(A)–(B). Section 23-364(E) permits an employee to file a "civil action to enforce this article . . . in a court of competent jurisdiction." And § 23-364(B) prohibits an employer from "subject[ing] any person to retaliation for asserting any claim or right under this article."

Arizona law also required Lindsay to provide Stangel with "a minimum of one hour of earned paid sick time for every 30 hours worked," § 23-373(B), and written notice of her rights pertaining to paid sick time at the start of her employment, § 23-373(A), and to track Stangel's earned paid sick time on her "regular paycheck," § 23-373(C). Section 23-374(B) then prohibits an employer from "engag[ing] in retaliation . . . against an employee or former employee because the person has exercised rights protected under this article. Such rights include but are not limited to . . . the right to file a complaint with the commission or courts or inform any person about any employer's alleged violation of this article[.]"

Under both § 23-364(B) and § 23-374(B), "retaliation" includes any "adverse action against an employee for the exercise of any right" or "interference with or punishment for in any manner participating in or assisting an investigation, proceeding or hearing under this article." § 23-364(A); *see* A.R.S. § 23-371(I) ("'Retaliation' is as defined in § 23-364(A)."). Further, "[t]aking adverse action against a person within ninety days of a person's engaging in the foregoing activities shall raise a presumption that such action was retaliation." § 23-364(B); *see Cadena v. Nextiva Inc.*, No. CV-24-03198-PHX-DJH, 2025 WL 1826705, at *6 (D. Ariz. July 2, 2025) (applying § 23-374(B)'s presumption to § 23-374(B)). An employer may rebut this presumption with "clear and convincing evidence that such action was taken for other permissible reasons." § 23-374(B). "Clear and convincing" means "the thing to be proved is highly probable or reasonably certain." *Kent K. v. Bobby M.*, 110 P.3d 1013, 1018–19 (Ariz. 2005).

Finally, § 23-364(G) provides these damages for violating the above statutes:

Any employer who fails to pay the wages or earned paid sick time required

> under this article shall be required to pay the employee the balance of the wages or earned paid sick time owed, including interest thereon, and an additional amount equal to twice the underpaid wages or earned paid sick time. Any employer who retaliates against an employee or other person in violation of this article shall be required to pay the employee an amount set by . . . a court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final.

**ii. Stangel has stated a claim for retaliation**

At the motion to dismiss phase, all Stangel need allege is that Lindsay took adverse action against her within 90 days of her protected action. Stangel filed her FAC on September 29, 2025, asserting claims for Arizona minimum wage and sick time. (SAC at 13.) The SAC alleges Lindsay then arranged for the Property inspection, which occurred on December 17, 2025. (SAC at 14, 16.) The Property inspection occurred 79 days after Stangel filed her FAC. Because this is less than 90-days, there is a presumption that Lindsay acted in retaliation for Stangel filing her FAC.

Lindsay argues the Property inspection cannot constitute retaliation because it was lawful under the Arizona Residential Landlord and Tenant Act, which grants a landlord the right to enter a rental property with two days' notice to "inspect the premises." A.R.S. § 33-1343(B). Lindsay also argues a "landlord who receives maintenance requests has an independent obligation to inspect the premises to assess and address those requests." (Doc. 26 at 6. (citing A.R.S. § 33-1324).) As litigation continues, Lindsay may rebut Stangel's retaliation allegations by showing he acted for "other permissible reasons." § 23-364(B). However, at the motion to dismiss phase, it would be improper for the Court to engage in this burden shifting analysis. *See Cadena*, 2025 WL 1826705, at *6. Moreover, even accepting that Lindsay had the authority to inspect the Property under Arizona law, this does not then mean that utilizing that authority improperly cannot constitute retaliation. *See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977) (retaliation is actionable even if the act, taken for a different reason, would have been proper).

. . . .

**iii. Stangel has stated a claim for unpaid sick time.**

The SAC alleges Lindsay did not track Stangel's accrued sick time and did not provide Stangel notice of her accrued sick time or even have a sick time policy, meaning Stangel is entitled to damages. (SAC at 18.) Lindsay argues the SAC fails to allege any harm from these supposed violations, namely that Stangel "ever requested sick time, ever was denied sick time, or ever suffered any actual loss attributable to the alleged tracking failure." (Doc. 26 at 8.) This argument is flawed. Because Lindsay did not give Stangel the requisite notice under § 23-373(A) or otherwise keep any record of Stangel's earned sick time under § 23-373(C), Stangel "could not request what she did not know about and what Lindsay did not offer." (Doc. 27 at 7.) Moreover, Lindsay cites to no authority requiring an employee suffer actual harm in order to recover under § 23-364(G). The SAC pleads sufficient facts to state a claim.

**2. Breach of Implied Covenant**

Lindsay argues the SAC relies on legal conclusions for its breach of the implied covenant of good faith and fair dealing claim and requests the Court dismiss the claim in its entirety. (Doc. 26 at 7–8.) Lindsay summarizes Stangel's claim as: "Lindsay breached the implied covenant by 'purporting to arbitrarily change the nature of Stangel's expenditures' and by 'creating an intolerable work environment.'" (*Id.*)

Lindsay's summary overlooks the SAC's additional allegations, namely that Lindsay breached the implied covenant by "attempting to use the [] Agreement to coerce sexual favors out of Stangel" and terminating Stangel's employment and not transferring the Property's title "to Stangel in retaliation for her objecting to his criminal actions and unlawful sexual advances; or, alternatively, by . . . Creating a work environment so hostile it resulted in Stangel's constructive discharge." (SAC at 16–17.)

The SAC alleges facts sufficient to support the above statements. The SAC alleges Stangel operated as Lindsay's personal travel coordinator. Under that Agreement, Lindsay directed Stangel to use his money and buy new clothing for herself and always "buy the best of everything and book the most luxurious accommodations" with no budgetary restrictions. (SAC at 6.) The SAC also alleges that, although Stangel submitted weekly

reports of purchases, after Stangel rebuked Lindsay's sexual advances, Lindsay stated Stangel's prior purchases were unauthorized and that Stangel must repay him with sex for the purchases or he would bring felony charges against her. (*Id.* at 7–8.) The SAC alleges Lindsay repeatedly made unwelcome sexual comments and advances, and that Lindsay threatened to abandon Stangel in a foreign county, all while Stangel was carrying out her duties under the Agreement. (*Id.*) The SAC also alleges Lindsay required Stangel to attempt to procure illicit drugs and prostitution for him. (*Id.* at 9). The SAC makes sufficient factual allegations to support Stangel's breach of implied warranty claim.

**3. Unjust Enrichment**

The SAC alleges unjust enrichment, which Stangel pleads as an alternative to the contract claims. (SAC at 21–22; Doc. 27 at 8.) Defendant requests, "[t]o the extent the Court finds a valid contract governs the parties' relationship, as the SAC primarily asserts, the unjust enrichment claim fails as a matter of law because a party cannot recover on both a contract and on a theory of unjust enrichment." (Doc. 26 at 9.)

Under Arizona law, "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Brooks v. Valley Nat. Bank*, 548 P.2d 1166, 1171 (Ariz. 1976) Put differently, where a party "could have pursued a breach of contract claim" because "contractual documents governed the relationship of the parties," that party cannot also claim unjust enrichment. *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 48 P.3d 485, 492 (Ariz. App. 2002), *as corrected* (June 19, 2002). The Court declines to find that the Agreement governed Stangel and Lindsay's relationship as a matter of law at this time, but Lindsay is free to move for summary judgment on this claim as litigation progresses.

**4. IIED**

Count 7 of the SAC is for IIED. (SAC at 21.) To state a claim for IIED, a plaintiff must satisfy the following elements: (1) "the conduct by the defendant must be 'extreme" and "outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Ford*

*v. Revlon, Inc.*, 734 P.2d 580, 585 (1987). There is liability where "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Further, "intentional infliction of emotional distress is often based upon claims of sexual harassment." *Id.* (citation omitted).

Here, Stangel has failed to plead adequate factual allegations to satisfy the third IIED element. The SAC states that Lindsay's behavior "caused Stangel to suffer severe emotional distress," without any factual details as to said distress. Accordingly, the Court finds the SAC fails to contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" as to the third IIED element. *Ashcroft*, 556 U.S. at 678; Complot v. US Bank NA, No. CV-25-00255-PHX-SMB, 2025 WL 2770857, at *13 (D. Ariz. Sept. 26, 2025), r*econsideration denied sub nom. Complot v. Credit Control, LLC*, No. CV-25-00255-PHX-SMB, 2026 WL 1792785 (D. Ariz. June 23, 2026) (conclusory allegation that plaintiffs "suffered severe physical and emotional distress" without "any facts demonstrating they have suffered severe emotional distress" are insufficient to state an IIED claim under Rule 12(b)(6)). The Court will grant Lindsay's Motion as to Count 6 but will give Stangel leave to amend if she should choose. Fed. R. Civ. P. 15(a)(2) (The Court "should freely give leave [to amend] when justice so requires.").

**5. 18 U.S.C. § 1591**

18 U.S.C. § 1591(a) of the Trafficking Victims Protection Act prohibits an individual from knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person, "knowing . . . or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act." "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." § 1591(3). "Coercion" means, in part, "threats of serious harm" or "the abuse or threatened abuse of

law or legal process." § 1591(2)(A), (C). "The term 'serious harm' means," in part, "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm . . . ." § 1591(5).

Lindsay argues the SAC does not state a claim under § 1591 because no commercial sex act was solicited, caused, or obtained because no sex act was given or received by Stangel. (Doc. 26 at 10–11.) As Plaintiff explains in her supplemental brief, the Ninth Circuit does not require that a sex act *actually* occur for there to be liability under § 1591. (Doc. 27 at 8–9.) In *United States v. Brooks*, 610 F.3d 1186, 1197, 1202 (9th Cir. 2010), the Ninth Circuit upheld the convictions of two defendants under § 1591 for sex trafficking two minor girls. Although one of the girls never actually engaged in a sex act, the court found evidence that the defendants acted knowing the child "would be caused to engage in a commercial sex act," namely by dressing the child in provocative clothing and bringing her to a hotel. *Id.* at 1197. The court explained:

> [w]hen an act of Congress requires knowledge of a future action, it does not require knowledge in the sense of certainty as to a future act. What the statute requires is that the defendant know in the sense of being aware of an established modus operandi that will in the future coerce a [person] to engage in prostitution.

*Id.* at 1197 n.4. (quoting *United States v. Todd*, 584 F.3d 788, 792 (9th Cir.2009)). Put differently, a court may find a defendant violated the statute if evidence supports the defendant "had plans for [a person] to be caused to engage in prostitution in the future," even where the person did not actually engage in prostitution. *Id.* at 1197.

The SAC alleges facts supporting that Lindsay planned to purchase the Property; hire Stangel as his personal travel coordinator, have Stangel purchase luxurious travel accommodations and new clothing for herself and join Lindsay on the trips, accuse Stangel of making unauthorized purchases on Lindsay's dime, and threaten Stangel that he would bring felony charges against her if she did not repay her "debt," all to coerce Stangel to engage in commercial sex acts—i.e., sex in exchange for the Property, trips, and other goods, and to avoid legal penalties and being abandoned in a foreign country. (SAC at 6–11, 19-21.) Specifically, the SAC states that "Lindsay implied by his words and

actions that he would withdraw his accusations and legal threats and resume reimbursing Stangel for expenses if she would have sex with him" and, after Stangel rebuffed Lindsay's advances, Lindsay "terminated Stangel's employment and made it clear that he would not be deeding the Property to her." (SAC at 8, 11.) The SAC states a claim for relief under § 1591.

**6. Summary**

In sum, the SAC states adequate claims for relief for retaliation, failure to pay Arizona sick time, breach of implied covenant of good faith and fair dealing, and federal sex trafficking, and the Court will deny this portion of the Motion. However, the SAC fails to state a claim for relief for Unjust Enrichment and IIED, and the Court will grant this portion of the Motion.

## IV. Attorneys' Fees and Costs

Both parties request fees and costs under 28 U.S.C. § 1927. (*See* Docs. 8 at 17, 16 at 11 (Lindsay's requests); Doc. 13 at 16. (Stangel's requests).) This statute provides that "[a]ny attorney or other person admitted to conduct cases" in federal court "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Lindsay does not explain his request. (*See* Docs. 8 at 17, 16 at 11.) Stangel, on the other hand, argues Lindsay's Motion to Dismiss "critically relies on counsel's assertions, made without any supporting evidence, that Stangel's residence is in Texas and that she 'lives and works there.'" (Doc. 13 at 16.) Stangel argues these are false assertions that counsel "either did not make reasonably inquiry about . . . or are presenting them for an improper purpose." Stangel's counsel believes Lindsay's "counsel's certification of their Motion containing those baseless representations violates [Rule] 11(b)(1) and (3)." The Court encourages both parties to reasonably assure that the information in their briefings is accurate as required under Rule 11. However, the Court does not find that either the Motion or SAC were entirely unreasonable or vexatious and will decline to award either party fees under 28 U.S.C. § 1927.

Lindsay also requests fees under 28 U.S.C. § 1919, which provides for the payment of "just costs" "whenever any action or suit is dismissed in any district court," and any Arizona statute "allowing recovery of Attorneys' fees and costs." (Doc. 8 at 17.) Because this Order will not dispose of the action, the Court will deny Lindsay's request.

**V. Order**

Accordingly,

**IT IS ORDERED granting in part** Defendant's Motion to Dismiss (Doc. 8) and **dismissing without prejudice** Count 6 for Intentional Infliction of Emotional Distress in the Second Amended Complaint.

**IT IS FURTHER ORDERED denying** the remainder of Defendant's Motion to Dismiss (Doc. 8).

**IT IS FURTHER ORDERED denying without prejudice** the parties' requests for attorneys' fees.

**IT IS FURTHER ORDERED granting** Plaintiff leave to file an amended complaint, solely to amend Count 6, by **October 2, 2026.**

**IT IS FINALLY ORDERD** that Defendant shall **answer** the operative complaint **after October 2, 2026 and before October 16, 2026.** If Plaintiff files an amended complaint, Defendant shall not file a motion to dismiss and must answer that complaint. Defendant may raise any additional dismissal arguments in a future motion for summary judgment, but litigation shall proceed forward at this juncture.

Dated this 24th day of September, 2026.

John C. Hinderaker
United States District Judge