**Silence Law Group, PLLC**
20235 N. Cave Creek Rd. Ste 104 # 460
Phoenix, AZ 85024
**Jeffrey Silence** (029143)
Direct Dial: (602) 932-8358
Email: jeff@silencelaw.com
**Trevor Cook** (037952)
Direct Dial: (602) 932-5868
Email: trevor@silencelaw.com

**Shields Petitti & Zoldan, PLC**
**James Burr Shields**
Direct Dial : (602) 718-3331
Email: burr@shieldspetitti.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cameron Stangel,<br><br>Plaintiff,<br><br>v.<br><br>Jeffery Lindsay,<br><br>Defendant. | Case No. 4:25-cv-00471-JCH<br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>(Hon. John C. Hinderaker) |

Plaintiff Cameron Stangel alleges the following and demands trial by jury on all claims and issues for which she has the right to trial by jury.

## Parties and Jurisdiction

1. Plaintiff Cameron Stangel is a citizen of the state of Arizona.

2. Defendant Jeffery Lindsay is a citizen of the state of Texas.

3. From April 12, 2024, until September 2024, Lindsay was an "employer" of Stangel as defined in the following:

SILENCE LAW GROUP

SILENCE LAW GROUP

A. Arizona Revised Statutes ("A.R.S.") § 23-362,

B. A.R.S. § 23-371, and

C. A.R.S. § 23-1501.

4. The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Stangel and Lindsay are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Concurrently, the Court has federal question jurisdiction under 28 U.S.C. § 1331 over Stangel's federal claim under the Trafficking Victims Protection Act.

**Stangel Meets Lindsay**

6. In 2022, Stangel and her long-term partner, Beau Reichert, discovered a property they liked in Bisbee, Arizona, located at 6 Naco Rd. (the "Property").

7. Stangel and Reichert decided to sell their ranch in Texas and relocate to the Property in Bisbee.

8. In part due to Reichert's previous experience in the antiques business, he and Stangel had accumulated personal collections of antiques and other collectible items.

9. Stangel and Reichert decided to sell their personal collections to raise money to purchase the Property and relocate to Bisbee.

10. For many years, they had attended events comprising the Round Top Antiques festival held twice a year in Round Top, Texas.

11. They rented a booth space at the Round Top Antiques Festival for the first time in March 2023 to sell their personal items to raise money for the Property and their move.

12. Because of their success at the spring show, they rented a booth space at the Round Top Antiques Festival fall show in October 2023.

13. While working their booth at the fall antique show, Stangel and Reichert widely shared their goal to purchase the Property and relocate to Bisbee.

14. Lindsay visited Stangel and Reichert's booth multiple times during the show.

15. From the first day Stangel met him, Lindsay frequently commented about his wealth, including at least once saying he had “more money than God.”

16. At one point, Stangel told Lindsay about why she and Reichert were selling at the antique show and how they hoped to sell their ranch to purchase the Property and relocate to Bisbee.

17. Lindsay told Stangel he was a west-Texas rancher and might know someone interested in buying Stangel’s ranch.

18. Stangel exchanged phone numbers with Lindsay.

19. In late March 2024, Lindsay contacted Stangel and asked her to meet up with him at the springtime Round Top Antiques Festival.

20. Stangel and Reichert agreed to meet Lindsay at the show.

21. The three spent a couple of hours together walking around the show.

22. During the visit, Stangel explained to Lindsay that she and Reichert still had not sold their ranch and might have to reevaluate their plan to relocate to Bisbee.

**Stangel and Lindsay Negotiate and Execute the Employment Agreement, and Stangel Moves to Bisbee**

23. On April 3, 2024, Lindsay texted and called Stangel to offer her a position as his “Personal Travel Coordinator” in return for the Property.

24. On April 11, 2024, Lindsay, Stangel, and Reichert met in Bisbee.

25. On April 12, 2024, Lindsay signed the papers to purchase the Property while in Bisbee.

26. Also on that day, Lindsay and Stangel executed the “Personal Travel Coordinator Service Agreement” (the “Employment Agreement”), copy attached as **Exhibit A**.

27. The Employment Agreement provided that Stangel would provide “travel coordination services” including but not limited to planning and organizing itineraries, preparing documents and applying for visas, booking transportation and accommodations, and providing recommendations for activities.



SILENCE LAW GROUP

SILENCE LAW GROUP

28. The Employment Agreement provided that, "[i]n exchange for" Stangel's travel coordination services, Lindsay would "compensate" her "with and [sic] rightful ownership of the buildings and parcels located at [the Property]."

29. The Employment Agreement provided that Lindsay would transfer the Property to Stangel either after the completion of 520 days of "active travel coordination" within 36 months of employment "or upon reaching the termination date [three years after the Employment Agreement goes into effect], whichever comes first."

30. The Employment Agreement provided that, in the event of Lindsay's death during the term of the Employment Agreement, "the estate shall immediately and automatically transfer the deeds of the properties located at [the Property] to [Stangel] as compensation for the services rendered."

31. The Employment Agreement provided that, during the term of the Employment Agreement, Stangel would pay for the taxes on and insurance for the Property.

32. Lindsay's purchase of the Property closed on May 15, 2024.

33. On April 15, 2024, Lindsay called Stangel and asked her to draft a residential lease for the Property ("Lease Agreement").

34. Lindsay insisted that only Reichert sign the Lease Agreement as tenant.

35. Stangel drafted the Lease Agreement, and Reichert and Lindsay signed it that day.

36. The Employment Agreement provided that it would commence the day of signing, April 12, 2024, and automatically terminate April 10, 2027. Ex. A. at 1.

37. Likewise, the Lease Agreement provided that the term of the lease would run from April 12, 2024, to April 9, 2027.

38. The Employment Agreement provided that Stangel "will pay the appropriate taxes and insurance on [the Property]." Ex. A at 1.

SILENCE LAW GROUP

39. The Lease Agreement provided that the tenant would pay for utilities, "home insurance throughout the lease term, with coverage for personal property and liability, with [Lindsay] named as an additional insured party," and property taxes.

40. The Employment Agreement provided that Stangel's duties as Travel Coordinator included planning trips from "home." Ex. A at 1.

41. Lindsay and Stangel intended that Stangel would live in the Property during the term of the Employment Agreement.

42. Lindsay and Stangel intended that Stangel would perform some of her duties under the Employment Agreement from "home" at the Property.

43. The terms of the sale of the Property provided that the seller had approximately thirty days to vacate the property and perform some necessary repairs.

44. Reichert moved his and Stangel's shared household into the Property in May 2024, after the repairs were completed and escrow closed.

45. In June 2024, Stangel returned from her first trip with Lindsay as his Travel Coordinator to the Tucson airport and went home from there to the Property.

46. Lindsay knew Stangel returned "home" to the Property in Bisbee.

47. Lindsay knew and knows that Stangel has resided at the Property continually since signing the Employment Agreement.

48. The Employment Agreement provided that "the Employer [Lindsay] agrees to cover all expenses associated with the Travel Coordinator position including any necessary equipment needed for travel planning (international WiFi, phones, etc), travel and accommodations, emergency medical, and anything else deemed necessary."

49. Lindsay gave Stangel a credit card to use to pay for her expenses under the Employment Agreement.

50. He also often gave her cash to pay expenses under the Employment Agreement.

SILENCE LAW GROUP

51. After she signed the Employment Agreement and until September 25, 2024, Stangel provided pre-travel and travel coordination services in accordance with the Employment Agreement.

52. Lindsay directed Stangel to use his money to buy herself new clothes for every trip and anything else she needed.

53. Lindsay instructed Stangel to always buy the best of everything and book the most luxurious accommodations for him and Stangel.

54. When Stangel asked for budgetary restrictions on those purchases and travel arrangements, Lindsay simply told her to spend and get whatever she needed.

55. Stangel asked Lindsay for permission to make any purchases outside of what Lindsay established as customary for their trips.

56. Stangel submitted reports of purchases she made as Travel Coordinator every week to Lindsay's assistant, Crystal Slate.

57. Lindsay required that Stangel accompany him on all travel she coordinated for him.

**The Trip**

58. Stangel coordinated travel for Lindsay, herself, and a husband and wife who were Lindsay's friends on a month-long private jet world tour operated by the Four Seasons (the "Trip").

59. Lindsay paid for the Trip for himself, Stangel, and two of his friends.

60. Stangel joined Lindsay on the Trip in her role as Travel Coordinator under the Employment Agreement.

61. Leading up to the Trip, Lindsay repeatedly told Stangel not to bring any money on the Trip because it was a work trip and he would pay for everything.

62. Lindsay, Stangel, and the two friends departed on the Trip in late August 2024.

63. While on the Trip, Lindsay questioned aloud how he would explain to other passengers why he and Stangel were staying in separate rooms.

SILENCE LAW GROUP

64. Lindsay made suggestive comments at dinners with the travel group that embarrassed Stangel, such as telling members of the group that Stangel could not eat too many oysters because she would get too "horny."

65. Many times, when Stangel went to Lindsay's room to discuss travel arrangements, Lindsay would answer the door in a state of partial undress and tell her to sit in his room while he dressed.

66. When Stangel would try to leave, Lindsay would get mad and blame her for "making" the situation "awkward."

67. Lindsay repeatedly asked Stangel to "model" swimwear for him in his room, and Stangel refused.

68. Lindsay repeatedly expressed disappointment to Stangel that he never saw her at the pool.

69. Lindsay's attitude toward Stangel became increasingly hostile as she rebuffed his unwelcome sexual advances.

70. For example, Lindsay told Stangel that if he can't see her in a swimsuit, then the purchase of that swimsuit—which he directed—was now unauthorized.

71. Lindsay began accusing Stangel of not following the Employment Agreement by using his money to pay unauthorized expenses.

72. But Lindsay had previously directed, approved, or encouraged all of Stangel's purchases as Trip Coordinator she made using the credit card and cash he gave to her to pay expenses under the Employment Agreement.

73. Stangel offered to print out for him the weekly expense reports she had provided to his assistant, Crystal Slade, and the credit card statements.

74. Lindsay refused the offer.

75. Stangel printed out the reports and credit card statements anyway and gave them to Lindsay, who accepted them from her.

76. Lindsay started to tell Stangel she was in debt to him under the Employment Agreement and would need to find a way to repay him.

77. Lindsay threatened to sue Stangel for the "debt" she owed him.

78. Lindsay threatened he would bring felony charges against her.

79. Lindsay repeatedly told Stangel that she would not have to repay him through "sex."

80. Lindsay told Stangel the only reason he had not had sex with her, yet, was because he was a "gentleman."

81. Lindsay implied by his words and actions that he would withdraw his accusations and legal threats and resume reimbursing Stangel for expenses if she would have sex with him.

82. Lindsay's sexual advances and threatening behavior escalated throughout the Trip.

83. As Lindsay's behavior escalated, Stangel grew increasingly distressed.

~~83.~~84. On September 11, 2024, Lindsay repeatedly confronted Stangel about her alleged "debts" to him.

~~84.~~85. At some point that day, Lindsay took back the credit card he had given Stangel to pay for expenses under the Employment Agreement.

~~85.~~86. At different times throughout that day, Lindsay alternated between threatening Stangel to sue her or kick her off the Trip and assuring her she would stay on the Trip and they would resolve their disagreement.

~~86.~~87. At some point on that day, Lindsay told Stangel he would "decide [her] fate at sundown."

~~87.~~88. Stangel feared abandonment with no money in a foreign country.

~~88.~~89. That afternoon, Lindsay expressed that he had decided to put his dispute with Stangel behind him.

~~89.~~90. But at 7:45 a.m. the next day, September 12, Lindsay called Stangel demanding a return of all the cash he had given her to cover expenses under the Employment Agreement.

~~90.~~91. Stangel returned the cash.



SILENCE LAW GROUP

~~91.~~92. Stangel and Lindsay were scheduled to fly together to Jordan later that night separately from the rest of the Trip group.

~~92.~~93. Stangel feared for her safety and texted Susan Cegavske, a manager for the Four Seasons on the Trip, and asked to speak with her.

~~93.~~94. That afternoon, Stangel met with Cegavske and described Lindsay's behavior and her experience on the Trip.

~~94.~~95. Later that afternoon, Lindsay called Stangel and asked her to find him a place where he could consume opium and engage the services of prostitutes.

~~95.~~96. Stangel told him she did not know where to find those things, but she would look.

~~96.~~97. Stangel was not sure what to look for to fulfill this request, but she researched the Bangkok red light district and sent Lindsay the information for a bar she believed to be a strip club.

~~97.~~98. Stangel called Lindsay and again told him she was not sure what to look for and asked if she should relay Lindsay's request to a Four Seasons concierge.

~~98.~~99. Lindsay agreed she should do so.

~~99.~~100. After ending the call, Stangel called Lindsay back to confirm again that he wanted his request for drugs and commercial sex to be relayed to the concierge.

~~100.~~101. Lindsay confirmed he did.

~~101.~~102. Stangel texted Lindsay's request to a concierge.

~~102.~~103. The concierge explained he could not assist with the request.

~~103.~~104. The manager Susan Cegavske texted Stangel, telling her she had heard about Lindsay's request and asked if Stangel was okay.

~~104.~~105. Stangel called Cegavske, but the call was repeatedly interrupted by calls to Stangel from Lindsay.

~~105.~~106. In the last call, Lindsay asked Stangel if he could come to her room.

~~106.~~107. Stangel said she preferred to meet elsewhere.

~~107.~~108. Lindsay responded, "Wrong answer" and told Stangel he was coming over.

109. As a direct and proximate result of the preceding unwelcomed, sexual and hostile treatment, Stangel feared for her immediate safety.

110. She also suffered from rapid heart rate.

111. Due to her fear and anxiety, she could sense her pulse in her ears to the point she could not hear well.

112. She also felt dizzy.

~~108.~~113. Lindsay came to Stangel's room and knocked on the door.

~~109.~~114. As Stangel opened the door, Lindsay forcefully pushed it open and entered, yelling~~.~~ (initiating the "Hotel Room Confrontation" described in paragraphs 114–29).

~~110.~~115. Lindsay forced Stangel to back away to avoid physical contact with him.

~~111.~~116. Lindsay continued forward toward Stangel until he backed her against a corner.

~~112.~~117. Lindsay physically blocked Stangel from any exits and continued yelling at her.

118. ~~Stangel told~~In response to this conduct, Stangel feared for her safety.

119. She felt unable to protect herself.

120. Her heart beat rapidly and her hands shook.

121. She had difficulty focusing on the situation.

122. Her mind both felt numb but also raced as she tried to think of how she might escape if Lindsay refused to leave.

~~113.~~123. Stangel managed to tell Lindsay she was uncomfortable being alone with him and told him to leave the room.

~~114.~~124. Lindsay did not leave the room.

~~115.~~125. Stangel's luggage was packed and on her bed.



SILENCE LAW GROUP

SILENCE LAW GROUP

~~116.~~126. Lindsay demanded that Stangel open her luggage and show him what she had in it to confirm she had brought items purchased for the trip and not left them in Bisbee.

~~117.~~127. Lindsay told Stangel that if she showed him all her personal belongings, he would know she was telling him the truth about not stealing from him, but if not, she was lying to him.

~~118.~~128. Stangel refused and told Lindsay she would call for help.

~~119.~~129. Lindsay said that he knew Stangel was a liar and left her room.

130. Once again, Stangel remained terrified for her safety.

131. Her ears were ringing.

132. She felt like her stomach had "dropped."

133. Her heart continued pounding.

134. She continued to feel unable to hear.

135. Her head felt "like it was a million miles away from [her] body."

~~120.~~136. Stangel immediately told the manager Cegavske about this latest incident.

~~121.~~137. Later in the evening, Cegavske and Director of Guest Experiences Javier Loureiro, told Stangel that Lindsay had called a meeting with all of them.

~~122.~~138. The four met in the lobby.

~~123.~~139. Lindsay began the meeting talking about how beautiful Stangel was.

~~124.~~140. Then, he admitted he came into Stangel's room, blocked her exits, and demanded she unpack her bags for him.

~~125.~~141. He also admitted to tasking Stangel to find him opium and prostitutes.

~~126.~~142. At the end of the meeting, Lindsay said he was cancelling the Employment Agreement and declared that he was now the owner of the Property.

~~127.~~143. In other words, Lindsay terminated Stangel's employment and made it clear that he would not be deeding the Property to her.

SILENCE LAW GROUP

~~128.~~144. After Lindsay left the meeting, the hotel staff told Stangel they had arranged for Stangel's and Lindsay's rooms to be on different floors for the remainder of the Trip and that they would take other precautions to protect her safety.

~~129.~~145. Cegavske gave Stangel $500 in U.S. currency and some Jordanian currency to use in case of emergency while she traveled with Lindsay separately from the group to the next stop in Jordan.

~~130.~~146. Even though Stangel was terminated on September 12, 2024, she continued to provide trip coordination services through the end of the Trip on September 24, 2025 because she knew he would be unable to immediately find a replacement.

147. After Lindsay left her room and for the remainder of the Trip, Stangel continued to fear for her safety and felt the physical symptoms of her emotional distress.

148. Stangel could not sleep.

149. When she did manage to sleep, she had nightmares of Lindsay trying to kill her.

150. When alone, Stangel kept obsessively aware of her surroundings, such as by looking into hallways before entering them, fearing and avoiding encountering Lindsay.

151. Stangel's mind continually raced and compelled her to think through scenarios of how she would respond if she encountered Lindsay, how she could escape or defend herself.

152. Stangel's fear caused an elevated heart rate and excessive sweating.

153. When Lindsay happened to be nearby, such as when Stangel was eating breakfast with a couple friends she had made on the Trip, Stangel would lose mental focus on everything but Lindsay, her heart raced, and her mind raced thinking how she might defend herself.

154. Two friends Stangel made on the Trip observed Stangel's emotional distress.

155. Out of concern for her, they offered to do what they could to help keep her safe.

156. After the Trip, Stangel feared Lindsay would show up at the Property.

157. Because of its association with Lindsay, she could not bear to be there on her return.

158. Stangel went to her mother's house in San Diego and stayed with her for a few days.

159. Stangel continues to fear Lindsay's appearance at the Property.

160. She feels physically sick when she sees reminders of him, such as pickup trucks driving by or cowboy hats.

161. Stangel never had trouble sleeping before the Trip.

162. After the Trip, she often wakes up multiple times in the middle of the night in fear with her mind racing.

163. She continues to have nightmares about Lindsay, his behavior toward her, and the Hotel Room Confrontation.

164. She cannot sleep in silence.

165. She must sleep with some noise in the background, or her mind will race and replay the Hotel Room Confrontation.

166. Since the Trip, Stangel has lost interest in many former hobbies.

167. Since the Trip, many activities that Stangel once enjoyed now feel more like "chores."

168. Since the Trip, Stangel feels compelled to always face an entrance or exit in any location where she is and avoid ever having her back to a door.

169. Since the Trip, Stangel has felt unable to share her distress with others.

170. As a result, she has had difficulty forming and maintaining social relationships.

171. Since the Trip, Stangel often has flashbacks of Lindsay's behavior toward her, his sexual comments, his demands that she repay her alleged debts, and his actions and presence during the Hotel Room Confrontation.

172. Before the Trip, Stangel experienced no difficulty engaging in sexual activity.



SILENCE LAW GROUP

SILENCE LAW GROUP

173. Since the Trip, Stangel has been unable to engage in sexual activity.

174. Each time Stangel has attempted sexual activity since the Trip, she has experienced the flashbacks described in paragraph 171.

175. During these flashbacks, Stangel feels overwhelming fear combined with of dizziness and senses of being suffocated and trapped.

176. Stangel cannot control or prevent this response.

177. The response leaves her incapable of proceeding with sexual activity.

178. Stangel's inability to engage in sexual activity has harmed her relationship with her partner of nearly 10 years.

179. Stangel's inability to engage in sexual activity and the concomitant harm to her most important personal relationship are direct results of Lindsay's conduct described in paragraphs 63–129, culminating in the Hotel Room Confrontation described in paragraphs 114–29.

180. After the Trip, Stangel sought treatment for the distress Lindsay's conduct caused.

181. Stangel was diagnosed with post-traumatic stress disorder arising from the events of the Trip.

**<u>Lindsay Retaliates Against Stangel for Filing Her Claims Against Him</u>**

~~131.~~182. Two days after the Trip, Lindsay texted Stangel: "DO YOU WANT TO TALK OR USE THE AMENDMENT CLAUSE….."

~~132.~~183. Stangel did not respond.

~~133.~~184. The following day, Lindsay texted Stangel again: "WELL NOW… NO ANSWER……SO THAT MUST MEAN…….BRING MY LAWYERS AND DO WHAT LAWYERS DO…NASTY….ARE YOU SURE THAT THIS IS THE AVENUE THAT YOU WANT TO TRAVEL…… I WAS THE ONE THAT WAS DONE WRONG ANY WAY YOU LOOK AT IT……"

~~134.~~185. Stangel did not respond.

135.186. The next day, Lindsay texted: "SURE LY WE CAN ACT AS ADULTS AND FIGURE THIS OUT .....IM OPEN TO SUGGESTIONS........."

136.187. Once again, Stangel did not respond.

137.188. The next month, October 2024, Lindsay unilaterally and without notice paid the property taxes that were the responsibility of Stangel under the Employment Agreement and of Beau Reichert under the Lease Agreement.

138.189. The next month, November 2024, Lindsay cancelled Stangel's premium payment on the home insurance policy Stangel had purchased for the Property and substituted his own payment.

139.190. Stangel retained counsel, and in December 2024 they sent a demand letter to Lindsay raising claims Stangel had against him, informing him of document preservation obligations in light of pending litigation, and offering to discuss settlement of the claims.

140.191. After four months, on April 9, 2025, Lindsay responded through counsel Jeremy T. Shorbe of Burris & Macomber, PLLC.

141.192. The response denied Stangel's claims and alleged claims against her.

142.193. Two weeks later, Reichert received a letter at the Property signed by Jeremy T. Shorbe of Burris & Macomber, PLLC, the lawyer and firm representing Lindsay in this action.

143.194. The letter accused Reichert of breaking the Lease Agreement by "not provid[ing] proof of insurance on the Property which names my client [Lindsay]," and by failing to pay the property taxes preemptively paid by Lindsay.

144.195. The letter offered Reichert the chance to cure the alleged breaches by paying "the outstanding amounts due."

145.196. Reichert and Stangel obtained counsel ("Eviction Lawyer") to assist and represent them in the Lease Agreement matter.

146.197. Through counsel, Reichert and Stangel attempted multiple times to tender the alleged amount due but were ignored.



SILENCE LAW GROUP

SILENCE LAW GROUP

~~147.~~198. Three weeks after the first letter, Shorbe sent another letter to Reichert purporting to terminate the Lease Agreement and stating that "all persons residing at the Property are instructed to immediately vacate the Property."

~~148.~~199. On June 9, 2025, Lindsay, filed an eviction action naming as defendants Beau Reichert and "John Does 1-3" and "Jane Does 1-3,"

~~149.~~200. D. Rob Burris and Jeremy T. Shorbe, of Burris & Macomber, PLLC, represented Lindsay in the action.

~~150.~~201. They are the same lawyers representing Lindsay in this action.

~~151.~~202. After a hearing, the Justice Court dismissed the case with prejudice.

~~152.~~203. Lindsay, through his same attorneys who also represent him in this action, appealed the Justice Court's decision.

~~153.~~204. The eviction action was baseless in part because Lindsay ignored Reichert and Stangel's attempts to cure the alleged breach of the lease.

~~154.~~205. Lindsay brought the eviction action to retaliate against Stangel's asserting her claims against him and to deter her from seeking legal redress.

~~155.~~206. Stangel filed her Complaint in this action on August 19, 2025.

~~156.~~207. The Complaint alleged, among other things, that Lindsay failed to pay Stangel Arizona minimum wage and Arizona sick time.

~~157.~~208. Lindsay did not answer the Complaint.

~~158.~~209. Stangel filed a First Amended Complaint on September 29, 2025.

~~159.~~210. The First Amended Complaint narrowed the relief Stangel sought from the Court but left the claims and factual allegations of the Complaint unchanged.

~~160.~~211. On November 17, 2025, through his Burris & MacOmber counsel, Lindsay filed a motion to dismiss Stangel's First Amended Complaint.

~~161.~~212. Three days later, Shorbe, the lawyer who signed the motion to dismiss, sent a "Notice of Inspection" addressed to Reichert, stating that the Property "will be entered and inspected by this firm on behalf of Landlord" "between the hours of 9:00

SILENCE LAW GROUP

A.M. and 5:00 P.M." on one of four dates in December from which the letter asked Reichert to choose.

~~162.~~213. Stangel and Reichert's Eviction Lawyer responded the next day by email on their behalf asking Shorbe to identify the purpose of inspection.

~~163.~~214. Shorbe responded by email the next day, asserting that that Lindsay, as landlord, had the right to inspect the Property on 48 hours' notice, and that "[d]ue to the nature of the ongoing proceedings, Mr. Lindsay's representatives (likely Crystal Slade and [other counsel with Shorbe in this action] Rob Burris of this office) will attend in his stead so as to have the visit occur in as smooth and peaceable a manner as possible."

~~164.~~215. In the email, Shorbe continued:

> While you're not entitled to object to any such duly noticed inspection:
> 1. Your clients have asked for thousands of dollars of work to be done;
> 2. We noticed an inspection back in the summer that we stated we would postpone;
> 3. No one on Mr. Lindsay's behalf has seen his Property or what your clients have done to it since Spring of 2024; and
> 4. The landlord doesn't need prior approval to ensure the state of the property so long as he complies with the notice requirements.

~~165.~~216. Hours later, Stangel's Eviction Lawyer responded by email with Stangel's and Reichert's preferred date and asking Shorbe to identify the purpose of inspection, its scope, expected duration, and the identities and roles of those who would enter the home.

~~166.~~217. Burris responded and confirmed the selected date, said he anticipated an inspection of no more than two hours, identified himself and his assistant Jo Lynn Goldner as the inspectors, stated "the landlord is not required to provide any basis for the inspection," and stated the reasons had already been provided in Shorbe's email quoted in paragraphs ~~161~~214 and ~~162~~215 above.

~~167.~~218. On December 17, 2025, at approximately 11:00 a.m., Jo Lynn Goldener and Darcy Damron, both from Burris & MacOmber, arrived at the Property to conduct an inspection.

~~168.~~219. They explained that Burris had planned to attend but could not at the last minute.

~~169.~~220. After initial pleasantries, no inspection commenced until Stangel's Eviction Lawyer, who was present, suggested that Reichert, who was also present, take Goldener and Damron on a "guided tour."

~~170.~~221. Goldener agreed and encouraged Reichert to mention any problems he observed with the Property.

~~171.~~222. Reichert guided Goldener around the Property for about twenty minutes, describing in detail various issues with the property and responding to occasional questions from Goldener.

~~172.~~223. Goldener carried a legal pad and a document titled "Residential Property Inspection Checklist" that contained checklist items under subjects including "Exterior," "Interior Structure," "Kitchen," "Bathrooms," and "Plumbing System."

~~173.~~224. Goldener rarely referred to the checklist and never checked an item or took any notes during the duration of the inspection.

~~174.~~225. At various times, Goldener asked Reichert questions about the Property, but she never took any notes of his detailed answers or visibly took a recording of them.

~~175.~~226. Halfway through the inspection, Goldener asked about whether and how Stangel's and Reichert's expensive photography equipment was insured.

~~176.~~227. Damron followed Reichert and Goldener but largely stayed out of Reichert's and Goldener's conversation.

~~177.~~228. Damron spent most of the inspection time some distance from Reichert and Goldener, taking photographs and video mostly unconnected to the subjects of Reichert's and Goldener's conversation.



SILENCE LAW GROUP

~~178.~~229. The inspection did not help Lindsay fulfill his duties or exercise his rights as a landlord.

~~179.~~230. The inspection was not intended to help Lindsay fulfill his duties or exercise his rights as a landlord.

~~180.~~231. Lindsay caused the inspection to be performed to harass and intimidate Stangel in retaliation for her filing her claims against him, including the claims of his failure to pay Arizona minimum wage and sick time.

~~181.~~232. Lindsay pursues his baseless appeal of the dismissed eviction action targeting Reichert and Stangel in retaliation for Stangel filing her claims against him, including the claims of his failure to pay Arizona minimum wage and sick time.

~~182.~~233. Stangel and Reichert want to continue renting booth space at the twice-yearly Round Top Antique shows, but they do not because they fear encountering Lindsay there.

**COUNT ONE**
**Breach of Implied Duty of Good Faith and Fair Dealing**

~~183.~~234. Stangel realleges the above paragraphs as if fully set forth herein.

~~184.~~235. Every contract in Arizona implies a covenant of good faith and fair dealing.

~~185.~~236. The implied covenant of good faith and fair dealing prohibits parties from exercising the discretion afforded to them in a contract in a way that deprives the other party of the benefits of the contract.

~~186.~~237. Lindsay breached the covenant of good faith and fair dealing by purporting to arbitrarily change the nature of Stangel's expenditures under the Employment Agreement.

~~187.~~238. Lindsay breached the covenant of good faith and fair dealing by attempting to use the Employment Agreement to coerce sexual favors out of Stangel.

~~188.~~239. Lindsay breached the covenant of good faith and fair dealing by creating an intolerable work environment for Stangel.

~~189.~~240. Lindsay breached the covenant of good faith and fair dealing by

A. Terminating Stangel's employment and not transferring title of the Property to Stangel in retaliation for her objecting to his criminal actions and unlawful sexual advances; or, alternatively, by

B. Creating a work environment so hostile it resulted in Stangel's constructive discharge, which meant that Stangel was deprived of the Property that she had been working diligently to earn.

~~190.~~241. These breaches are material.

~~191.~~242. Stangel has been irreparably harmed by these breaches because they deprived her of her only benefit of the bargain of the Employment Agreement: title to the Property.

~~192.~~243. Lindsay's breaches are the direct and proximate cause of the irreparable harm suffered by Stangel.

~~193.~~244. Stangel is entitled to equitable relief including enforcement of Lindsay's specific performance of the Employment Agreement by giving Stangel title to the Property.

~~194.~~245. Alternatively, Stangle is entitled to compensatory damages.

~~195.~~246. Stangel is entitled to an award of attorney fees under A.R.S. § 12-341.01.

**COUNT TWO**
**Failure to Pay Arizona Minimum Wage, A.R.S. § 23-364**

~~196.~~247. Stangel realleges the above paragraphs as if fully set forth herein.

~~197.~~248. Lindsay did not pay Stangel any wages for any of the time she worked for him pursuant to the Employment Agreement.

~~198.~~249. Lindsay's failure to pay Stangel any wages for the time she worked for him is a violation of the Arizona Minimum Wage Act.

~~199.~~250. The expenses that Lindsay paid for Stangel are not "wages" as defined by the Arizona Minimum Wage Act.



SILENCE LAW GROUP

~~200.~~251. Any employer who fails to pay at least the required minimum wage "shall be required to pay the employee the balance of the wages owed, including interest thereon, and an additional amount equal to twice the underpaid wages." A.R.S. § 23-364.

~~201.~~252. Plaintiff is entitled to a total of three times the amount owed in Arizona minimum wage, plus her attorneys' fees and costs, pursuant to A.R.S. § 23-364.

**COUNT THREE**
**Failure to Pay Arizona Sick Time**

~~202.~~253. Stangel realleges the above paragraphs as if fully set forth herein.

~~203.~~254. Arizona employees are entitled to accrue and use "earned paid sick time" for any of the reasons outlined under A.R.S. § 23-373.

~~204.~~255. Lindsay was required to track Stangel's accrued sick time.

~~205.~~256. Lindsay was required to provide Stangel ongoing notice of the amounts of her sick time accrued and used.

~~206.~~257. Lindsay did not track Stangel's accrued sick time.

~~207.~~258. Lindsay did not provide Stangel any notice of her accrued or used sick time or have a sick time policy.

~~208.~~259. Lindsay is liable for paying the full amount of unpaid sick time from the commencement of Stangel's employment on April 12, 2024, through and including September 24, 2025, plus an amount equal to twice that amount and attorney fees as mandated by A.R.S. § 23-364.

~~209.~~260. Stangel has been damaged in an amount to be proven at trial.

**COUNT FOUR**
**Wrongful Termination, A.R.S. § 23-1501**

~~210.~~261. Stangel realleges the above paragraphs as if fully set forth herein.

~~211.~~262. It is unlawful to terminate an employee in retaliation for disclosing to the employer that the employee reasonably believes violates an Arizona statute.

~~212.~~263. Unlawful imprisonment is a crime. A.R.S. § 13-1303.

SILENCE LAW GROUP

213.264. Criminal threatening and assault is a crime. A.R.S. § 13-1202 and A.R.S. § 13-12013.

214.265. Unlawfully obtaining labor or services through the threat of physical harm is a crime. A.R.S. § 13-1306.

215.266. Intentionally trying to cause a person to engage in any prostitution or sexually explicit performance by deception, force or coercion is a crime. A.R.S. § 13-1307.

216.267. Lindsay engaged in conduct that violated each of the statutes listed in paragraphs 212–215263–266.

217.268. Stangel objected to Lindsay's unlawful conduct, including when he trapped her in her own room and made her fear for her safety.

218.269. Hours later, at the meeting with Stangel and Four Seasons staff members Cegavske and Loureiro to discuss the incident, Lindsay said the agreement was cancelled and the Property was his in retaliation for Stangel objecting to his conduct, which conduct violated the criminal statutes listed in paragraphs 212–215263–266.

219.270. If Lindsay denies that he terminated Stangel, Stangel pleads an alternative claim for constructive discharge under A.RS. § 23-1502.

220.271. Stangel was not required to give 15 days' notice before resigning because Lindsay's criminal conduct was sufficiently outrageous.

221.272. Stangel was not required to give 15 days' notice before resigning because Lindsay never posted any constructive discharge notice requiring that Stangel provide such notice.

222.273. Stangel seeks tort damages, except for lost wages, including punitive damages and injunctive relief, including title to the Property.

**COUNT FIVE**
**Federal Sex Trafficking, 18 U.S.C. § 1591**

223.274. Stangel realleges the above paragraphs as if fully set forth herein.

SILENCE LAW GROUP

~~224.~~275. Lindsay and Stangel were citizens of different states during the term of the Employment Agreement.

~~225.~~276. Stangel's responsibilities under the Employment Agreement required planning with different entities and personally traveling with Lindsay to multiple states and countries.

~~226.~~277. Lindsay intended to coerce Stangel into having sex with him in return for title to the Property.

~~227.~~278. To that end, Lindsay

A. Recruited Stangel to be his employee under the Employment Agreement;

B. Enticed Stangel with seemingly favorable working conditions and opportunities for travel and other enjoyable experiences she would not otherwise have;

C. Transported Stangel at his expense to locations where she would be financially dependent on him; and

D. Solicited Stangel to perform a variety of personal services under the aegis of the Employment Agreement.

~~228.~~279. Lindsay tried to coerce Stangel to have sex with him in return for title to the Property, forgiveness of the "debt" he alleged she owed him, dropping his threat of a lawsuit against her, not stranding her in a foreign country, and allowing her to continue on the Trip by:

A. Requiring Stangel to accompany him on travel to isolated or foreign locations where she was financially dependent on him;

B. Implying through his words and actions that Stangel's satisfactory performance of the Employment Agreement depended on her positive response to his sexual advances;

C. Threatening to leave Stangel alone and without financial recourse in foreign countries as "punishment" for alleged breaches of the Employment Agreement; and



SILENCE LAW GROUP

SILENCE LAW GROUP

D. Threatening to sue Stangel for alleged breaches of the Employment Agreement.

~~229.~~280. Stangel was damaged in an amount to be proved at trial.

~~230.~~281. Lindsay's extreme and outrageous behavior in his violation of 18 U.S.C. § 1501 entitles Stangel to punitive damages.

~~231.~~282. Stangel seeks all available damages, except lost wages, including attorneys' fees and costs under 18 U.S.C. § 1593(b), 18 U.S.C. § 2259(c)(2), and 18 U.S.C. § 1595(a).

~~232.~~283. Stangel also seeks injunctive relief, including title to the Property. But for Lindsay's actions that violate the federal sex trafficking law, Stangel would have continued working for Lindsay and received title to the Property.

**COUNT SIX**
**Intentional Infliction of Emotional Distress**

~~233.~~284. Stangel realleges the above paragraphs as if fully set forth herein.

285. "Cases which involve extreme and outrageous intentional invasions of an individual's mental and emotional tranquility allow recovery solely for the emotional distress absent any consequential physical injuries." *Ford v. Revlon, Inc.*, 734 P.2d 580, 586–87 (Ariz. 1987).

~~234.~~286. Lindsay's conduct was extreme and outrageous.

287. Lindsay intended by his extreme and outrageous conduct to cause Stangel emotional distress.

288. Any reasonable woman of Stangel's stature relative to Lindsay's under the circumstances of the Trip would feel extreme emotional distress as a result of Lindsay's conduct on the Trip.

289. Lindsay escalated his extreme and outrageous coercive behavior in reckless disregard of the near certainty of that distress resulting from his conduct.

SILENCE LAW GROUP

~~235.~~290. Lindsay's extreme and outrageous conduct caused Stangel to suffer severe emotional distress.

~~236. Lindsay intended through his behavior to cause severe emotional distress.~~

~~237. Lindsay escalated his extreme and outrageous coercive behavior in reckless disregard of the emotional distress that would result from his conduct.~~

291. The cumulative effect of Lindsay's unlawful conduct caused Stangel to suffer severe emotional distress, which manifested in various physical and medical symptoms, among them elevated heart rate, excessive sweating, nightmares, sleep loss, racing thoughts, flashbacks, preoccupation with personal safety, loss of interest in activities previously enjoyed, fear triggered by associations with Lindsay, difficulty maintaining social relationships, an inability to engage in sexual activity, concomitant harm to her relationship with her partner, and a diagnosis of post-traumatic stress disorder.

~~238.~~292. Stangel seeks all available tort damages for the outrageous conduct she endured.

**COUNT SEVEN**
**Unjust Enrichment**

~~239.~~293. Stangel realleges the above paragraphs as if fully set forth herein.

~~240.~~294. To the extent the jury finds no contract between the parties or that no contract between the parties governed the parties' conduct relative to the claims summarized in Counts One through Four, Stangel pleads this alternative claim for unjust enrichment.

~~241.~~295. As set forth above, Lindsay was unjustly enriched by Stangel's provision of travel coordination and other personal services without return consideration and in circumstances causing her emotional suffering.

~~242.~~296. Stangel was unjustly impoverished in many ways by Lindsay's compelling her to provide travel coordination and other personal services in the hope of compensation that never materialized, including but not limited to the costs and

inconvenience of moving to a new state with the expectation she would settle there at the Property and not receiving title to the Property.

~~243.~~297. There is no justification for the enrichment of Lindsay or the impoverishment of Stangel.

~~244.~~298. Stangel has damages in an amount to be proven at trial.

**COUNT EIGHT**
**Retaliation for Asserting Rights Under Arizona Minimum Wage Statute**
**A.R.S. § 23-364.B**

~~245.~~299. Stangel realleges the above paragraphs as if fully set forth herein.

~~246.~~300. Lindsay arranged for the "property inspection" of December 17, 2025, to harass, intimidate, and drain the physical and mental resources of Stangel in retaliation for her filing her claims against him, including the claim of his failure to pay Arizona minimum wage.

~~247.~~301. Lindsay continues to pursue his baseless appeal of the dismissed eviction action targeting Reichert and Stangel in retaliation for Stangel filing her claims against him, including her claim of his failure to pay Arizona minimum wage.

~~248.~~302. Lindsay's retaliation against Stangel was and is intentional, malicious, and conducted with an evil mind.

~~249.~~303. Stangel has suffered direct, consequential, and emotional harms from the retaliation compensable in an amount to be determined by the Court.

~~250.~~304. Stangel is entitled to an amount set by the Court sufficient to compensate her for this retaliation and deter future violations, not less than $150 for each day the violation continues or until legal judgment is final. *See* A.R.S. § 23-364.B and .G.

~~251.~~305. Stangel seeks all damages available for Lindsay's retaliation against her, including attorneys' fees.

**COUNT NINE**
**Retaliation for Asserting Rights Under Arizona Earned Paid Sick Time Statute**
**A.R.S. § 23-374.B**

1. Stangel realleges the above paragraphs as if fully set forth herein.



SILENCE LAW GROUP

SILENCE LAW GROUP

2. Lindsay arranged for the "property inspection" of December 17, 2025, to harass, intimidate, and drain the physical and mental resources of Stangel in retaliation for her filing her claims against him, including her claim of his failure to pay Arizona sick time.

3. Lindsay continues to pursue his baseless appeal of the dismissed eviction action targeting Reichert and Stangel in retaliation for Stangel filing her claims against him, including her claim of his failure to pay Arizona sick time.

4. Lindsay's retaliation against Stangel was and is intentional, malicious, and conducted with an evil mind.

5. Stangel has suffered direct, consequential, and emotional harms from the retaliation compensable in an amount to be determined by the Court.

6. Stangel is entitled to an amount set by the Court sufficient to compensate her for this retaliation and deter future violations, not less than $150 for each day the violation continues or until legal judgment is final. *See* A.R.S. § 23-364.B and .G.

7. Stangel seeks all damages available for Lindsay's retaliation against her, including attorneys' fees.

**Demand for Trial by Jury**

Stangel demands trial by jury on all claims and issues.

**Relief Requested Against Lindsay**

Stangel requests judgment against Lindsay as follows:

A. For specific performance of Lindsay's obligation under the Employment Agreement, namely to take all actions necessary to transfer the Property to Stangel;

B. For the applicable Arizona minimum wage for all hours Stangel worked, for which no payment of any kind was made to Stangel;

C. For an additional amount equal to twice the amount of unpaid Arizona minimum wage as mandated by A.R.S. § 23-364;

SILENCE LAW GROUP

D. For unpaid sick time paid at the applicable minimum wage as mandated by A.R.S. §23-364;

E. For an additional amount equal to twice the amount of the unpaid sick time as mandated by A.R.S. § 23-364;

F. All available damages except for lost wages resulting from Lindsay's violation of 18 U.S.C. § 1595, 18 U.S.C. § 1591, and A.R.S. § 23-1501, including injunctive relief, which would include, without limitation, transfer of title for the Property to Stangel;

G. For punitive damages for Lindsay's violation of 18 U.S.C. § 1591 and A.R.S. § 23-1501;

H. For compensatory damages Stangel suffered as a result of Lindsay's intentional infliction of emotional distress;

I. For punitive damages for Lindsay's intentional infliction of emotional distress;

J. For an amount set by the Court sufficient to compensate Stangel for Lindsay's retaliation against her for asserting her rights under Arizona's minimum wage and earned paid sick time statutes and to deter future violations, not less than $150 for each day the violation continues or until legal judgment is final, along with compensatory damages and punitive damages. *See* A.R.S. § 23-364.B and .G;

K. For attorneys' fees and costs under A.R.S. §§ 12-341 and 12-341.01;

L. For attorneys' fees and cost under 18 U.S.C. § 1595(a);

M. For attorneys' fees and costs under A.R.S. § 23-364.G; and

N. Such other relief as the court deems just.

DATED this 2d day of October, 2026.

**Silence Law Group PLLC**

*/S/ Trevor Cook*
Trevor Cook
Jeffrey Silence
James Burr Shields
*Attorneys for Plaintiff*

SILENCE LAW GROUP